1                      IN THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF NEBRASKA
2

     COR CLEARING, LLC,            )
3                                  )
               Plaintiff,          )        8:15CV317
4                                  )
          vs.                      )        Omaha, Nebraska
5                                  )        November 10, 2015
     CALISSIO RESOURCES GROUP,     )
6    INC., et al,                  )
                                   )
7              Defendants.         )

8

9                       TRANSCRIPT OF PROCEEDINGS
                   BEFORE THE HONORABLE LYLE E. STROM
10                 SENIOR UNITED STATES DISTRICT JUDGE

11

12                      A-P-P-E-A-R-A-N-C-E-S

13   FOR COR CLEARING, LLC
     and ALPINE SECURITIES:        Mr. Michael T. Hilgers
14                                 Gober Hilgers Law Firm
                                   14301 FNB Parkway
15                                 Suite 100
                                   Omaha, NE 68154
16

17   FOR TD AMERITRADE CLEARING
     and TD AMERITRADE, INC.,:     Mr. William F. Hargens
18                                 McGrath North Law Firm
                                   1601 Dodge Street
19                                 Suite 3700
                                   Omaha, NE 68102-1627
20

21   COURT REPORTER:              Ms. Brenda L. Fauber, RDR, CRR
                                   111 S. 18th Plaza
22                                 Suite 3122
                                   Omaha, NE 68102
23                                 (402) 661-7322

24

     Proceedings recorded by mechanical stenography, transcript
25   produced with computer.

```
 1              (At 8:57 a.m. on November 10, 2015, with counsel for the

 2      parties present, the following proceedings were had:)

 3              THE COURT:  This is COR Clearing, LLC, a Delaware

 4      limited liability company, plaintiff, versus Calissio

 5      Resources Group, Adam Carter, Signature Stock Transfer, and a

 6      number of those.

 7          For the plaintiff, COR Clearing, could we have appearance

 8      of counsel, please.  Mr. Hargens -- Mr. Hilgers, pardon me.

 9              MR. HILGERS:  Good morning, your Honor.  Mike

10      Hilgers, counsel for plaintiff COR Clearing, as well as

11      counsel for interested party, Alpine Securities.

12          Next to me, your Honor, is Mr. Carlos Salas, who is the

13      CEO of COR Clearing, and Mr. --

14              THE COURT:  What's -- how's he spell his name?

15              MR. HILGERS:  S-a-l-a-s.

16              THE COURT:  All right.

17              MR. HILGERS:  And Mr. Mark Bell --

18              THE COURT:  Bell?

19              MR. HILGERS:  Yes, sir.

20              THE COURT:  Who is going to do the speaking, you?

21              MR. HILGERS:  I'll do the speaking, your Honor.

22              THE COURT:  And then for the defendant?

23              MR. HARGENS:  Your Honor, actually I represent two

24      interested parties, TD Ameritrade Clearing, Inc., and TD

25      Ameritrade, Inc.  They received notice pursuant to the Court's
```

1    instructions and we filed an opposition to the motion.  That's

2    why we're here today.

3        It's William Hargens representing those two entities.  To

4    my right is Chad Johnsen -- that's with an e-n -- who has

5    submitted a declaration in support of our opposition.  He's

6    with TD Ameritrade, Inc.  And then to my far right is James

7    Vihstadt, V-i-h-s-t-a-d-t.  And Mr. Vihstadt is an in-house

8    attorney at TD Ameritrade.

9              THE COURT:  Who are going to be the speakers?

10             MR. HARGENS:  I will be speaking --

11             THE COURT:  Mr. Hilgers and Mr. Hargens?

12             MR. HARGENS:  Yes, your Honor.

13             THE COURT:  All right.

14       Well, the matter's -- we're having a hearing today with

15   respect to the application that's been made for appointment of

16   a receiver.

17       So Mr. Hilgers, I'll put the ball in your court and hear

18   from you.

19             MR. HILGERS:  Thank you, your Honor.

20       Your Honor, on behalf of COR Clearing, we're very

21   grateful to have this time in front of you this morning,

22   partly --

23             THE COURT:  Don't thank me.  I was trying to find

24   some way to avoid this.

25             MR. HILGERS:  I understand, your Honor.  Part of the

1    reason is because we have -- my client has lost nearly

2    $5 million.  And there's a remedy that exists to repair that

3    loss that we have -- for which we have 90 days to trigger that

4    remedy, and we're about at day 86.

5         THE COURT:  We think it ends next week, but you folks

6    think it ends Thursday or Friday, I think.

7         MR. HILGERS:  Conservatively, we've calculated about

8    Friday, your Honor, conservatively.

9         THE COURT:  Well, I'm going to -- whatever I do, I'm

10   trying to -- going to try to get something filed today on it.

11        MR. HILGERS:  Thank you very much, sir.

12        The other reason we're grateful is because the pleadings

13   and the briefings -- there's been a lot of paper submitted in

14   front of the Court and a lot of discussion about what really

15   are pretty complex, complicated financial transactions.  And I

16   think it's helpful to take a step back and talk about what's

17   undisputed because what is undisputed is very clear and, I

18   think, supports the right -- the relief that we seek.

19        And what is undisputed, your Honor, is that the defendant

20   Calissio committed a fraud and that fraud resulted in nearly

21   $5 million being erroneously and wrongly debited from my

22   clients' COR Clearing and Alpine Securities accounts.

23   Undisputed.

24        It is also undisputed that that money then flowed to

25   member firms.  And some of that money, at least $1.7 million,

1   and potentially as much as most or nearly all of those funds,

2   went to the defrauding party.  It's undisputed.

3       It's also undisputed, your Honor --

4           THE COURT:  To Calissio?

5           MR. HILGERS:  To Calissio, yes, sir.

6           THE COURT:  All right.

7           MR. HILGERS:  In a minute, I'll want to -- we have a

8   demonstrative.  I'll walk through the transactions and provide

9   some more detail.  But at a high level, your Honor, this is

10  the situation we're dealing with, and it's undisputed.

11      It is also undisputed that the clearing house entity,

12  DTC -- there's been a lot of discussion of DTC that's at the

13  center of this transaction -- it has a rule that was drafted

14  and agreed upon long before we ever stepped into this

15  courthouse, that if applied, would reverse that transaction,

16  would reverse the debit, would reverse the credit; my clients

17  would be made whole.

18      It's undisputed if Calissio happened to show up today and

19  tell DTC that they wanted to reverse that transaction, there

20  would be no objection -- there may be some other legal

21  remedies, but there wouldn't be an objection process, there

22  wouldn't be an objection to that action.

23      The only reason we're here before your Honor is because

24  Calissio is the defrauding party.  And they hold the keys to

25  resolving the fraud.  Normally when the fraud occurs, you

1    identify the fraud and the money's gone.

2        In this instance, we have a rare opportunity.  We know

3    the fraud happened, we know it existed, and we've got a remedy

4    to undo it if we act quickly.

5        The only reason we're here, your Honor, is because

6    Calissio won't -- because they profit from the fraud, they

7    won't pull the trigger on the remedy.  And in consultation

8    with DTC, DTC has told us that if -- with a limited purpose

9    receiver, which is fully within this court's powers to grant,

10   that limited purpose receiver standing in the shoes legally of

11   Calissio doing one thing and one thing only, which is

12   requesting that DTC trigger the agreed-upon rule to undo those

13   transactions.  That's a one-page letter, your Honor, maybe two

14   paragraphs at most.

15       And if they do that, that's the only responsibility of

16   this receiver.  It's not a complex accounting.  There's not

17   other actions that we ask the Court -- ask the receiver to

18   take.  That one action.  That one action will put the parties

19   back to where we started from the beginning, will undo this

20   harm.

21       If the Court doesn't act, if the Court doesn't act and

22   this 90-day period expires, my clients will have lost almost

23   $5 million through absolutely no fault of their own that was

24   just taken from their accounts and they won't be able to get

25   it back.  Calissio is a sham company that has no assets and

1    has absconded with the money.  This is the one remedy in front

2    of --

3              THE COURT:  Where are we going to get the money then?

4              MR. HILGERS:  Where -- the money will come -- so the

5    transactions were credited to the member firms.  There are 67

6    member firms that were provided notice by COR Clearing as part

7    of your Honor's order.  We got that list from DTC.

8         Those 67 firms were credited various sums as part of the

9    debit that was taken from my client's accounts.  Of those 67

10   firms, only one has objected.  So the others have -- they're

11   not objecting, DTC is not objecting to this process.

12        So what the four corners of the receiver will do is only

13   reverse the credit to the member firms.  It won't necessarily

14   do anything to any shareholders down the line.  It's only the

15   member firms.

16        And we know some firms actually have held on to that

17   money in light of the lawsuit that's been filed in front of

18   the Court.  So -- and they're waiting for some resolution.

19        So that money will come from the member firms, not from

20   the shareholders.  I want to talk about that in a few minutes.

21   But that's kind of a red herring at least for what the

22   receiver is being asked to do.  This receiver has one purpose,

23   reverse the credit to the member firms.  If it doesn't act,

24   we're going to lose $5 million through no fault of our own.

25        Now we've created this demonstrative, your Honor, to walk

 1    through some of the transaction.  There's been a lot of

 2    complicated -- in the briefing, it's kind of a complicated

 3    financial transaction.  But at a very high level, Judge, it's

 4    really pretty straightforward.

 5         And if I do this right -- okay.  In a normal transaction,

 6    Judge -- not one that we have today.  The one we're dealing

 7    with today is not normal.  There's a fraud.

 8         In a normal transaction, a company would announce some

 9    amount of dividend.  They would pay -- say they wanted to do a

10    $1.3 million dividend.  They would give that money to DTC.

11    That's this clearing house agency.

12         Without DTC there, Judge, it would be very difficult and

13    time-consuming to figure out who has the shares -- for the

14    company to figure out who has the shares and to pay off the

15    money individually.  So DTC provides a service where they are

16    the clearing house.  They get the money in and they distribute

17    it out.  Normally, in a normal transaction, that money goes to

18    the entities that hold the shares.

19         Now, in some instances in the way that DTC accounting

20    works, sometimes it is possible for an erroneous dividend,

21    say, to be paid.  And in that instance, DTC has a rule that

22    allows for those to be undone within 90 days.  We've talked a

23    lot about it.  In the normal case though, the money goes to

24    where it should go, DTC performs the role it should, and we're

25    just fine.  That was not the case that we had here.

1        So what happened here is Calissio announced a dividend

2    payment of $1.3 million.  Now it put a restriction on that

3    payment.  And it said that only those parties -- I'm sorry,

4    only people, individuals or entities that own shares with a

5    record date of June 30th -- in other words, they were in

6    existence by June 30th -- they would receive shares.  And

7    that's a key date.  If you own the share before June 30th or

8    it was in existence, you get a dividend; if you own it

9    afterwards, you don't.  You don't get a dividend.

10        So we don't know how much money -- we think it's less

11    than $1.3 million, but Calissio provided some level of funding

12    to DTC to pay some of these dividends.  So we know that.

13        As part of this though, your Honor, what we also know is

14    that almost $5 million were taken from COR Clearing and Alpine

15    Securities' accounts.

16        Now I'm going to talk about why that happened.  It's this

17    interim accounting.  It's been in the briefs.  It's been in a

18    lot of the discussion.

19        But putting aside the why for a moment, it is undisputed,

20    your Honor, undisputed, that that was erroneous.  And I would

21    like to call up, if I might -- we have an email that's in the

22    record, Judge.  It's an August 25th, 2015, email.  Do you have

23    that in front of you, your Honor?

24            THE COURT:  I do not.

25            MR. HILGERS:  Well, it's on your screen.  We don't

 1    have printed copies.

 2         So this is an email from a Mr. Adam Carter.  And Calissio

 3    is -- purports to be -- or purported to be a company -- a

 4    Nevada company that invested in mining projects in Mexico.  We

 5    now know through an investigation that that company is a sham.

 6    It has no offices; it has no assets.  This individual who held

 7    himself out as the president throughout this process, we think

 8    -- we have reason to believe isn't even a real individual.

 9    There's no such Adam Carter that might exist.

10         But at least on August 25th, your Honor, when -- and this

11    is about four days after we had notice.  So we had notice that

12    DTC was going to debit the funds.  We immediately sprung into

13    action.  This isn't right.  We contacted the appropriate

14    parties.  And Mr. Carter emails Mr. Salas, who is sitting here

15    next to me, and says in the body of the email at the top, he

16    says -- we'll bring it up for your Honor.

17         He says:  As you are aware -- we'll highlight it.  He

18    says:  As you are aware there has been a huge glitch/error on

19    how the dividend was supposed to be paid out.  So this is the

20    president/agent of Calissio saying hey, you know what, guys?

21    This is wrong.  This is wrong.

22         And it's not just Calissio saying that it was wrong.  If

23    we could pull up TD Ameritrade's brief, which is docket number

24    41, and we'll bring it up to the screen for your Honor.  This

25    is the response brief filed by TD Ameritrade.

1          And if we could turn to page 3 of that brief, at the

2     bottom, and there's a -- the last full sentence, it says:  Due

3     to that fraudulent scheme, those innocent investors were

4     credited with dividends that, in hindsight, should not have

5     been credited to them.

6          Okay.  So Calissio says it's an error.  TD Ameritrade

7     concedes it's an error.  We say it's an error.  It's totally

8     undisputed.

9          How that happened I'll discuss in a second.  It has some

10    complicated financial aspects.  But at the end of the day,

11    your Honor, there's no dispute that there's an error.

12         The reason why this occurred -- and this is what Calissio

13    was taking advantage of in the marketplace -- is this -- DTC

14    calls it a product, but it's a service that they provide

15    called interim accounting.  And what that means is -- DTC

16    again is at this hub of the wheel.  And they pull in money,

17    and they take -- and they expend -- and they pay out

18    dividends.  So they pull in and they pay out.

19         And they pull in from people who own the shares as well.

20    So if you have a share and you sell that share and it has a

21    right to a dividend, the way that it works is your account, if

22    the purchaser of the share has a right -- purchases a right to

23    the dividend, they get a credit from your account, and then

24    you get the dividend paid from the company.

25         So you, if you sell the dividend, you know, you pay out

1    and you get in and you're at zero.  And the purchaser of that

2    share gets the dividend.  So that's how it's supposed to work

3    if they're eligible shares.

4         If it's an ineligible share and the accounting -- it

5    pulls out the debit, if it's ineligible, it won't get a

6    credit.  All of a sudden the party with the share loses money

7    and doesn't get the money coming in to make it neutral.

8         And that happens sometimes.  And the reason that it

9    happens is that DTC -- and they acknowledge.  They say, look,

10   we don't have -- we have an imperfect process.  And in the

11   vast majority of cases, your Honor, there's no real issue with

12   having an ineligible share receiving a dividend because the

13   record date and the payment date are very close together, very

14   close together.

15        And in this case, however, the record date -- that's the

16   date the shares become eligible for the dividend -- is

17   preceded, by about 45 days, the date when the payments were to

18   be made.  And in that intervening period, a whole bunch of

19   shares were put on the market, none of which had any right,

20   any right to a dividend.  Undisputed.

21        And what happened was DTC doesn't have a mechanism of

22   saying, well, these aren't eligible and these are.  These are

23   eligible and these aren't.  It just treats them all as

24   eligible.

25        And that's imperfect, and it's an imperfect system.  But

1    the way that it's mitigated, that imperfection is resolved, is

2    by the mechanism that fixes errors.  So DTC says okay, we

3    understand an error might occur.  You might have a share that

4    we think should be eligible for a dividend that, in fact, is

5    not.

6        If that happens, we'll reverse it.  And we'll have a

7    mechanism to reverse it.  That's the mechanism we've been

8    talking about, the 90 days; not within two days or five days,

9    within 90 days.  In fact, that mechanism, before this year,

10   used to be 120 days, your Honor.  That's a long time.  But now

11   it's 90 days, and they can fix it.

12       So what happened here is that COR Clearing and Alpine

13   Securities' clients sold shares that were not eligible for

14   dividends.  But because DTC treated them like all the shares

15   thinking that they were eligible, they pulled out the money.

16   But because they weren't eligible for shares, there was no

17   dividend.  And also because there was a fraud and there was no

18   money coming in.  So all of a sudden Alpine and COR Clearing

19   are out almost $5 million.  No one disputes that that should

20   not have happened.

21       So -- can we go back to the demonstrative, please?

22       That's only half of the equation, your Honor.  It doesn't

23   do Calissio very much good if all they're doing is pulling out

24   money from my clients.

25       The other half of the equation is the critical part.  And

1   that is when that money came in, a lot of it, at least $1.7

2   million and potentially much, much more, went to Calissio.

3   And we know that because Calissio participated in a public

4   share buyback program where they bought maybe 150 million

5   shares.  That's just what they announced to the public.  We

6   already know that they're using aliases and fictitious

7   personnel to communicate with us and with others.  They may

8   have had other affiliates that aren't named Calissio that also

9   bought shares.  But we know at least 1.7 million.  That's in

10  Calissio's hands.  That's a windfall.  They're not entitled to

11  it.  That's a fraud.  They should not get it.

12      Now, there is a fix.  We talked about it a lot but I want

13  to pull up the language.

14      If we could turn to -- if we could turn to the DTC

15  Service Guide, which is document number 22-2, and this is the

16  Guide, your Honor, that's been in a lot of the briefing.  TD

17  Ameritrade, my client, everyone agrees that this is a

18  governing document for how DTC operates.  And it's been quoted

19  in the briefs, but I just want to show your Honor the language

20  as it exists in the document.  And if we turn to page 32 and

21  if we could highlight the About Charge-Back and Adjustments.

22      It says:  On occasion, after crediting participants with

23  a dividend or interest payment, DTC may have to create a post

24  allocation rate change which may result in either additional

25  credit or a debit to your account.  Reasons to this include

1    but are not limited to an error on the part of DTC, the paying

2    agent, trustee, or issuer, or a change in the principal factor

3    or rate on CMO/ABS security.

4        You'll note at the bottom, just for the record, it says

5    -- where it says "Note" that's effective January 1st.  It

6    actually went from 120 days to 90 days.  So it used to

7    actually be a lot longer of a period of time.

8        That's the trigger, your Honor.  It's baked into the

9    system.  It's hard wired into the system.  Before we ever

10   stepped into this courtroom, the member firms agreed to this

11   system and contemplated that an error could occur and the

12   credit from the member firm could be reversed.  It's

13   contemplated in the system.

14       The only issue and the only reason we're here is because

15   the only way that can be triggered is through the issuing

16   party Calissio.  They're the fraudulent party.  This doesn't

17   contemplate what happens when a fraudulent party -- this

18   contemplates normal business transactions.  So it doesn't

19   contemplate who should make -- who should make -- who's able

20   to ask for -- or a request to trigger this remedy.

21       And that's why COR Clearing can't just go to DTC and say

22   well, it's an error and you should trigger it, because DTC

23   says you're right, it is an error, but you're not Calissio.

24   We need Calissio.  Well, Calissio is in Mexico or gone

25   somewhere.  They're gone.

1          The only way that we can pull that trigger, pull that

2     failsafe, remedy the situation recording to the rules of the

3     game, is by having a receiver standing in the shoes of

4     Calissio and doing what they otherwise have every right to do

5     and that is exactly what we're asking the Court to do, just

6     that remedy.

7          If we could go back to the demonstrative?  We have a few

8     slides, your Honor.  We will -- we don't have a hard copy of

9     these slides because they dynamically build afterwards.  If

10    the Court would like, we can email the Court a copy of these

11    slides for reference.

12         Again we're focusing on the undisputed facts.  There are

13    some disputed facts.  There's been the briefing on some side

14    issues.  At the end of the day, the undisputed facts

15    establish, under the Eighth Circuit authority and this court's

16    equitable powers under Rule 66, that a receiver should be and

17    must be granted.

18         The first is that we have a valid claim.  There is no

19    doubt we have a valid claim.  In fact, we have a claim against

20    Calissio and Calissio has defaulted.  They have not shown up

21    in this courthouse to defend themselves.  We had monies

22    wrongly taken from us.  There's no doubt we have a valid

23    claim.

24         There's also no doubt really that this will do more good

25    than harm.  And it's critical to understand this point because

1    there's some suggestion, well, you were balancing what might

2    be done to shareholders -- which we'll get to in a minute, it

3    doesn't really directly impact shareholders.  We're going to

4    have to balance that with what maybe -- what you did, what COR

5    Clearing did, how do we do that balancing?

6         Well, the reality is, Judge, this balancing has been done

7    for us already.  This is part of the rule, baked into the

8    system.  DTC and the member firms decided that the way to

9    solve -- it was a good -- it was a good procedure to have, a

10   remedy to possible errors.  They've already decided that's

11   good.  In fact, it would do more harm than good to refuse to

12   trigger that remedy because not only would it impact my client

13   severely and I think render a severe injustice to my clients,

14   but it would also upset settled expectations about how the

15   system should work.  Because once you say this rule can't

16   apply because some fraudulent party, then my clients don't

17   have the benefit of resolving errors.  And that's -- we submit

18   that's not a good thing.

19        Briefly, your Honor, some of the other factors, really

20   the only remedy available to us -- another one of the factors

21   under the Eighth Circuit framework, this is the only remedy to

22   us.  DTC has told us -- we work collaboratively with DTC.

23   They said look, if you get a limited purpose receiver, we'll

24   undo it.  If you get that receiver, we'll undo it.  If we

25   don't, we can't.  And if we can't, and if we can't do it in

1    the next four to six days, however you calculate it, that

2    money is gone.  Calissio is a shell company.  It has no assets

3    in the United States.  It's gone.  The only remedy that we

4    have is a receiver and a receiver appointed in the next couple

5    of days.

6         There's also -- briefly, your Honor, there's also little

7    doubt that one of the factors is whether a party will profit

8    from the fraud.  Again, we know Calissio is getting

9    $1.7 million at a minimum, much -- likely much higher.

10   Reversing that will -- if we don't act -- if the Court doesn't

11   act or if there's not a receiver, they'll be able to take that

12   money and run.  There's no way to reach Calissio.  There's no

13   way to reach them now.  They're outside the power of this

14   court and they're certainly outside the power of COR Clearing.

15        There's been a lot of arguments, Judge -- I'm not going

16   to address -- we'll stand on our briefing for a lot of the

17   objections that were raised.  The only objector that has come

18   forward to the court, as I mentioned of the 67 that were

19   notified, is TD Ameritrade.  They raised a lot of objections,

20   a lot of which we think don't have -- aren't really related to

21   the discrete relief that we're requesting here.  And a lot of

22   those objections, we'll just stand on the briefing unless, of

23   course, the Court has any questions for us.

24        But the one that I do want to address, because there's

25   been a lot of these emails coming through from people who

1    purport to be shareholders and we don't know who those people

2    are, but there's a lot -- there's a suggestion in the

3    briefing, a suggestion in the emails that if COR Clearing gets

4    their receiver, then those shareholders will be -- they will

5    be grievously harmed; and because of that harm, perhaps the

6    receiver should never -- should not be appointed in the first

7    place.

8         And I want to address that.  And the first fundamental

9    point is that there's no -- they have no legal right to our

10   money.  No one suggests or could suggest that this was not

11   erroneously taken from our accounts.  It was taken from our

12   accounts and given -- it was a windfall.  No one suggests that

13   they have any legal right to the funds of COR Clearing or

14   Alpine.  And that's a really critical starting place.

15        But the second one is what I -- the second point is what

16   I mentioned before, your Honor, which is what we're asking for

17   -- I've talked a lot about the rules of the game.  Well, those

18   rules only apply to DTC and the member firms.  That's it.  And

19   that's all we're asking for, to trigger that remedy between

20   those entities.

21        Now we know -- so it doesn't necessarily mean that these

22   shareholders will be impacted at all.  We know, for instance,

23   that one -- as I mentioned, one large member firm has held

24   back the money.  We know that a number of others haven't

25   objected.  So we can infer, at least, from those instances

1    that potentially their shareholders won't be harmed because

2    they've taken steps.

3         But even if the member -- see, these member firms have a

4    responsibility, Judge, to their shareholders.  This is penny

5    stock.  This isn't IBM.  This isn't HP or some blue chip

6    company.  These are penny stocks.  The SEC says if you're

7    going to broker for your customers to be in these arenas, you

8    need to take responsibility and inform them of the risks that

9    they could lose all their money.  I mean, it's walking into

10   the casino is what this is.  These are speculators, it's penny

11   stocks, and they have responsibilities.

12        So the member firms, they may decide that hey, you know

13   what?  We got this credit.  We had this credit that was a

14   windfall.  We paid it to our shareholders, now it's reversed.

15   Those member firms may say, you know what?  We shouldn't go

16   after our shareholders because we're in the wrong.

17   Potentially they're in the wrong.  Potentially they had

18   notice, they didn't act; potentially their shareholders

19   detrimentally relied on their activities.  We don't know.

20        But to suggest that appointing a receiver necessarily

21   means these shareholders will be harmed is just simply not

22   right.  Just is not right.

23        The other point on the shareholders, we put it in a

24   supplemental reply yesterday, your Honor, and I'll just

25   briefly reiterate that reply now.

1          The stock price, when the clients -- when COR Clearing's

2     clients started selling the stock -- this is early August --

3     the dividend was at just about a penny, just a little over a

4     penny.  The stock price, so the people who bought the shares,

5     was a fraction of a penny.  It never went above a penny.  So

6     the people buying these shares were essentially buying a share

7     and now trying to get a dividend that was in excess of what

8     they paid for the share in the first place.  That's not

9     typically how markets work.  Typically markets don't provide

10    that kind of windfall.

11          And so what we're saying is if you're in this market, in

12    the penny stock market, and you're trying to get a dividend

13    that's not priced -- the share that's not priced above the

14    dividend that it purports to have, you should be on notice

15    that there's a red flag here, that there's something amiss

16    because there was something amiss.  And that was they were

17    buying shares that didn't have a dividend right attached to

18    them.

19          So we think the shareholder argument in sum, your Honor,

20    is a red herring.  It doesn't go to the discrete relief that

21    we're seeking here today.  And it ought not -- we submit it

22    ought not to dissuade the Court, if it is otherwise inclined,

23    to grant the motion and appoint the limited receiver.

24          So your Honor, we think when you just focus on the

25    undisputed facts and the limited relief that we seek, applied

1        to the rules of the game as they were instituted before we

2        walked in this courtroom, we strongly and respectfully urge

3        the Court to grant this limited relief, allow us to have the

4        receiver appointed, have this letter written.  He will

5        discharge his responsibilities and we will be done.

6             So for all the reasons in our briefing and argument, your

7        Honor, if the Court doesn't have any particular questions,

8        that's all I have.

9             THE COURT:  Well, I might before it's over with, but

10       let me hear from Mr. Hargens.

11            MR. HARGENS:  Thank you, your Honor.  May it please

12       the Court.  I, too, appreciate the opportunity to be here

13       today for a couple of reasons in particular, and that is as

14       we've noted in our papers, your Honor, this is a very extreme

15       remedy that's being requested here.  This isn't your

16       run-of-the-mill motion for appointment of a receiver who is

17       going to take over a business that's struggling, insolvent,

18       accused of fraud or whatever, and it's just going to manage

19       its affairs and ultimately act at the direction of the Court

20       to wind up its affairs at some point.

21            Here, the motion asks for a final judgment.  If your

22       Honor grants this motion and it's acted upon by the DTC in the

23       manner that's represented here today, the case is over.

24       $5 million gets moved back into the accounts of the plaintiff

25       and the party Alpine that stands with it through the same

1     counsel here today, and $5 million comes out of other accounts

2     and ultimately comes out of the pockets of innocent

3     shareholders as well as, based on the representations that are

4     made here today, Calissio.  Of course, Calissio's account as

5     far as we're informed is worthless.  It's gone.

6         So we think it's important, your Honor, and we've

7     mentioned this in our brief, that there actually be some

8     evidence.  While we obviously don't have the time or the

9     right, since we're a nonparty, to conduct discovery, but we

10    think it would be appropriate here today to put on some live

11    testimony, your Honor, to get into a few of the issues that

12    are raised and in addition to getting into the question of the

13    relief granted.

14        We have two fact witnesses here that have submitted

15    declarations.  That would be Mr. Salas on behalf of COR,

16    Mr. Johnsen on behalf of TDA.  And I would propose after my

17    initial remarks that I'd like to call them to the stand and

18    ask them a few questions.

19        But before doing so -- I'm not asking for leave at this

20    point to do so, but I'd like to respond to a few of the

21    comments made by Mr. Hilgers.

22        First of all, very little of what Mr. Hilgers says is

23    undisputed is, in fact, undisputed in this case.  I'm going to

24    go right through the list of what he mentioned and comment on

25    those.

1          Did Calissio commit a fraud?  As far as we know.  Now,

2     we've not had an opportunity to conduct any discovery.

3     Calissio is not here.  We can't put them on the stand to hear

4     their side of the story.  But based on what COR has

5     represented in this case, it appears that there was a fraud.

6          Interestingly enough, the fraud apparently was

7     participated in by two other parties, one of whom is, I guess,

8     now in Mexico, according to COR's papers; one of whom has

9     actually entered an appearance in this case and that's the

10    transfer agent who was involved in this.  And although the

11    transfer agent has filed a motion to dismiss, it's my

12    understanding that there's been no opposition filed to that.

13    And I don't know that one is due at this point, and the Court

14    obviously hasn't ruled on that.

15         But there is another party here when we start talking

16    about other remedies that may be available.  We certainly have

17    one other defendant that's still standing that, as far as we

18    know, has money, that according to COR's allegations in its

19    complaint, was right in the middle of the fraud and therefore

20    should be responsible for the $5 million that they claim that

21    they and Alpine are out.

22         So is there a dispute as to the fraud?  I can't really

23    dispute it because I haven't had an opportunity to conduct

24    discovery or to otherwise investigate the background of the

25    fraud.

1          Is it undisputed that there was an erroneous credit and

2     debit as a result of these dividends that were paid on the

3     stock issued between the record date and the ex-dividend date?

4          And Mr. Hilgers did quote correctly out of our brief in

5     which -- my brief said that it appeared that, in fact, the

6     stock was not eligible for the dividend.

7          Well, I stand corrected on that, Judge.  That's not

8     necessarily the case.  And we're prepared to put on some

9     evidence here this morning that's going to call that into

10    question.  And I'd prefer to do that through the examination

11    so as to not show my hand, as it were, on where I'm going with

12    that.  But that is going to be disputed by the time we're done

13    here today.

14         They claim that most of the ill-gotten, as it were, or

15    tainted dividends went to Calissio.  They say that at least

16    $1.7 million went to Calissio.  I'm not sure how we know that.

17    Now, Mr. Salas has submitted a declaration wherein he

18    indicates that based on their records ma large portion of the

19    amount went to Calissio.

20         But how do we know that?  I'd like more information on

21    that.  I'd like an opportunity to examine Mr. Salas about

22    that.  But the point is, your Honor, that's not $5 million.

23    1.7 million doesn't equal $5 million.  So just doing the

24    simple math, there's another $3.3 million that went somewhere

25    else, and a million -- close to a million, 930-some thousand

1    dollars was credited to TD Ameritrade Clearing or TDAC, which

2    in turn credited its customers' account -- or the accounts of

3    TD Ameritrade's customers who bought this stock believing that

4    it was entitled to receive the dividend.

5         Now, I find it really upsetting, your Honor, that --

6    first of all, these shareholders, although you've seen the

7    emails they've been sending in, they're not here to defend

8    themselves personally, at least I don't know that anybody's

9    here on their behalf. But I think it's -- it's upsetting that

10   if you look at their first brief that was filed with this

11   Court -- and I apologize, I don't have the PowerPoint where I

12   can pull things up. But if you look at COR's first brief that

13   was filed for the Court, in footnote 3 on page 8, they say

14   shareholders innocently received dividends. Flip that around.

15   Innocent shareholders received dividends.

16        And what I'm hearing now -- in fact, in this latest

17   supplemental reply is that somehow this is all those

18   shareholders' fault, that they got what was coming to them;

19   that hey, they're speculating in penny stocks; they should

20   have known that they might have to give back the dividends

21   that were credited to their account. They should have known

22   by the basis of what they were paying that somehow -- that

23   these stocks didn't qualify for the dividends.

24        Well, the fact of it is, your Honor, these shareholders

25   had no way of knowing that the stock, if it didn't qualify for

1    dividends, in fact wasn't eligible.  I mean, they have no

2    reason to know that.  They are truly innocent here.

3        And at the end of the day when you're weighing the

4    equities, that's what you're weighing the equities between; is

5    between whether COR, who was as close to this fraud as you can

6    get if there was, in fact, a fraud -- in fact, it was COR who

7    cleared by, according to Mr. Salas's declaration, the issuance

8    of the 475 million shares -- 475 million shares that were

9    supposedly converted through some debt instrument that we

10   don't see in the record by their customers, Nobilis and

11   Beaufort.  It was their customers.  Notice, we haven't heard

12   anything in the PowerPoint, in the comments, in their briefing

13   about explaining that involvement.

14       What involvement did COR have in this conversion?  What

15   did they know about the conversion of the stock that ends up

16   getting sold, supposedly a large portion of it to Calissio,

17   and apparently is also cleared through COR?

18       You know, I found it interesting that there's, I guess,

19   some accusation now that TD Ameritrade needs to police penny

20   stock investing.  Well, look at the facts of this case.  It's

21   COR that's involved in the issuance of 475 million shares of

22   penny stocks.  It apparently cleared those stock sales.  It

23   knows from its own records how much was purchased by the

24   company that defrauded it.  Where were they when this policing

25   should have taken place?

1          And as we've discussed in our brief, if there are two

2     parties that are equally harmed or potentially harmed by the

3     fraud, it's the one that's the closest to the fraud.  It's the

4     one that had the chance to potentially prevent it that should

5     bear the loss, not the innocent shareholders.

6          And to suggest, your Honor, that all that's going to

7     happen here is the TD Ameritrades of the world are going to

8     step up to the plate and just eat these losses, well, frankly,

9     your Honor, obviously that's not going to happen.

10          What's going to happen is that the TD Ameritrades of the

11     world are going to charge back, to the extent they can, any

12     reversal of the credits that were given for these dividends.

13          Now, in TD Ameritrade's case, they're going to be

14     short -- we'll put on evidence of this -- something in the

15     neighborhood of $220,000, because this money doesn't

16     necessarily just stay in the accounts, it moves in and out.

17          And so even if they went back to the accounts as of -- I

18     think we calculated it last Friday and reversed the credits of

19     the dividends to those of its customers that got the credits

20     in the first place, you'd have about $220,000 that TDA

21     couldn't just credit.  They'd actually have to go to

22     collection, hire lawyers to pursue these people.

23          So at the end of the day, that's who's going to bear the

24     loss.  And to suggest that the TDAs -- TD Ameritrades of the

25     world are just going to eat it is just not the case.

1    Now, there was a mention, one of its competitors, I

2    believe it's E-Trade that was holding the money and that

3    somehow this isn't going to result in a harm to a

4    shareholder -- or the shareholders.

5    Well, that's not the case.  What they've done, your

6    Honor -- and we haven't at this point -- is restricted those

7    accounts so they can't take the money out.  So the dividend is

8    still sitting there.  And what they're going to do, if you do

9    what they want and the DTC follows through, is they're going

10    to go back into those accounts that they've restricted and

11    take that money back out.  The money at the end of the day

12    comes back from the shareholders to the extent there's money

13    still there.

14    And I think it's important to understand, you know, they

15    -- COR argues in its brief that all you're going to do here,

16    your Honor, is restore the status quo ante; you're just going

17    to put everybody back where they were.

18    Well, that's not true.  The only party you're going to

19    put back to where they were is COR.  Again, assuming the DTC

20    carries through with what they claim it's agreed to do, and I

21    want to comment on that in a minute.

22    You can't restore the status quo ante to those

23    shareholders.  You can't, because they have paid money for

24    that stock which they believed qualified for a dividend.

25    COR's not going to give them that money back.  They wouldn't

1      have purchased the stock -- I mean, I think it's fair to

2      assume they wouldn't have purchased that stock but for the

3      assumption that it qualified for the dividend.

4           How are you going to restore them to the status quo ante?

5      Is COR going to give them back the money they paid for the

6      stock?  I don't see that being tendered here anyway.  No, you

7      can't restore them to the status quo ante.  You can't restore

8      my clients to the status quo ante because if it was as simple

9      as here's credit, you're going to take it away, that's fine.

10          But what you're requiring my client to do is, first of

11     all, chase customers to the tune of, you know, almost a

12     quarter of a million dollars to get back the credits.  We

13     don't know how much of that is collectable.  If nothing else,

14     we've got to hire lawyers or collection agencies to go get

15     them.

16          And you've got the impact on our customer relations.  I

17     mean, the fact is that, you know, we're going to have to go

18     into our customers' accounts and take money back out.  That

19     doesn't make for a very happy camper when you're talking about

20     investors.  So you can't restore everything to the status quo

21     ante.

22          Now, another thing that's supposedly undisputed is that,

23     first of all, the DTC rule applies in this scenario and that

24     DTC is going to follow that rule and reverse the credits and

25     debits that were issued with respect to the various clearing

1    houses.

2        If you look at the rule, your Honor -- and again, I

3    apologize, I don't have it on a PowerPoint -- but there's one

4    simple sentence.  And I'll just read it.  "On occasion after

5    crediting participants with a dividend or interest payment,

6    DTC may have to create a post allocation rate change" -- a

7    rate change -- "which may result in either an additional

8    credit or a debit to your account."

9        We'll put on evidence to this effect, your Honor, but

10   what that normally applies to is a simple error on the amount

11   of a dividend or an interest payment.  If it's off two cents

12   one way or the other, the DTC will come back and make a post

13   allocation rate change.  They'll fix the rate of the interest

14   payment or dividend.

15       Now, it's represented to the Court that there's been

16   meetings with the DTC and that the DTC has said, yup, we'll

17   fix it.  We'll do what you're gonna do, just get a receiver

18   appointed and have him give us that direction.

19       Well Judge, of course, that's all hearsay.  And DTC isn't

20   here.  There's no declaration submitted on behalf of DTC.

21   There's been no opportunity for us to examine DTC regarding

22   this rule and whether it should, in fact, apply.

23       And as Mr. Hilgers pointed out, this is a rule that

24   applies to all member institutions.  And it's just assumed

25   that all member institutions think that this is something

1    where you can just undo $5 million in credits and debits

2    resulting from what is claimed to be a fraud.

3        Well, we don't think the rule should apply.  And at this

4    point, we don't have any evidence from DTC itself that it

5    thinks that the rule applies and it's going to apply the rule.

6        I want to talk about a couple other points.  I think I've

7    responded to all of what proclaim to be the undisputed

8    facts -- oh, except for one.  I might not have -- I might have

9    touched on this.

10       COR claims that its only remedy here is to avail itself

11   of this rule.  I've mentioned one reason why that's not true,

12   and that's that they do have a claim against a remaining

13   defendant that they say was complicit in the fraud.

14       But they also are in a position to go after their

15   customers who contributed to the fraud.  And in this

16   context -- again, we don't have Nobilis and Beaufort before

17   the Court.

18       But what we do know is that Nobilis and Beaufort,

19   according to COR's own submissions, converted some alleged

20   debt to equity -- interesting the timing of that, three weeks

21   before the dividend is to be paid -- which, according to COR's

22   papers, Nobilis and Beaufort knew was not eligible for a

23   dividend.

24       They then go and dump it on the market for -- according

25   to COR again, what COR submits in their papers -- was only

1    $700,000.  That's in the case of Nobilis.  They don't have an

2    exact number for COR -- excuse me, Beaufort.  I, doing some

3    extrapolation, estimate that as 200,000.  But at least

4    $700,000 was received by its customer, Nobilis, as a result of

5    the sales of this stock, which Nobilis knew -- Nobilis knew,

6    according to COR, did not -- was not eligible for the

7    dividend.

8        Well, the question then is if it did that conversion

9    knowing that there was no dividend that should attach to that,

10   what obligation did they have to disclose that to the market?

11   What obligation did they have to disclose that to COR?

12   Shouldn't COR be talking to Nobilis and Beaufort about their

13   role, if any, in this supposed fraudulent scheme?  So that's

14   another potential remedy.

15       In fact, the irony of this is it's Nobilis and Beaufort

16   that really get the windfall here, in addition to Calissio

17   based on what they claim was the case, because they're the

18   ones that went out and got somewhere -- again I'm estimating,

19   somewhere in the neighborhood of $900,000 as a result of this,

20   and they're not here.  They're not asked -- being asked to

21   account for their, quote, windfall.

22       So with that, your Honor, I think I've covered -- I don't

23   want to go back and rehash everything in our brief.  I think

24   I've covered the salient points.  And then I'd ask the Court's

25   permission to put on some live testimony that I think might be

1   important to the resolution of the issues.

2            MR. HILGERS:  May I respond briefly, your Honor?

3            THE COURT:  Yeah.

4            MR. HILGERS:  Certainly whatever the Court will

5   permit, we will certainly do.  But I don't think that the

6   discovery -- any live testimony will help or is really germane

7   to the core issue --

8            THE COURT:  How do you know until I hear it?

9            MR. HILGERS:  Well, that's fair.  We didn't hear

10  exactly what that would be, although we heard some snippets.

11       For instance, one of the snippets we heard of what might

12  be put on for testimony is how much TD Ameritrade might be

13  out, two hundred and some thousand dollars.  There might be

14  some testimony and evidence as to what loss they might have.

15       Again, when the inquiry is just whether or not we can

16  stand in the shoes of Calissio to trigger this remedy, the

17  loss -- whatever TD Ameritrade -- that's baked into the

18  system.  They have 90 days to reverse an error.  What the loss

19  is that they may have, that's what the loss is.  But that's

20  what the agreement was.

21       There were some other suggestions -- I mean, the whole --

22  really the whole response was let's broaden the inquiry and

23  then try to suggest that there are fact issues or other

24  problems beyond really what the inquiry before the Court is

25  which is should a receiver be appointed just to trigger this

1    rule?

2         So for instance, there's a suggestion that what -- we

3    should go after our customers, that maybe our customers were

4    close to this fraud and that they played a role.  Maybe we

5    should go after them.

6         Well, the truth is, your Honor, first, there's no

7    suggestion or real evidence of any kind whatsoever to suggest

8    that they did.  But we also know that they were harmed by this

9    fraud.  They sold the shares which, as counsel acknowledged,

10   did not have dividend rights for less than $1 million.  And

11   subsequently to that, their accounts got charged for over

12   $3 million worth of dividends.

13        So if they were in any way complicit with some sort of

14   fraud, they didn't do it -- they didn't it the right way.  So

15   there's no suggestion that the customers -- real -- no

16   evidence, real suggestion that they had any role to play, that

17   we should start suing our customers.

18        There's another suggestion, just sort of going in reverse

19   order, your Honor, that, well, the DTC rule doesn't apply as

20   we say it should apply.

21        Well, two points:  One, DTC hasn't submitted something,

22   but they haven't objected.  And two, if counsel is correct,

23   then DTC will just ignore the receiver.  We're not going to

24   all this work, after consultation with DTC, to do this to have

25   a letter sent to DTC that they'll just ignore.  This is the

1    communications they've provided to us.  They said this is the

2    one remedy.  This is the only remedy that we can do to unwind

3    the fraud -- or the error.  Because even if it's not a

4    fraud -- and all indications are that it is -- it just needs

5    to be an error.

6         As to the point of the application of the rule, I think

7    that's a pretty constrained reading of the rule, which is that

8    it only applies to errors.  It says including but not limited

9    to errors.

10        And errors -- it doesn't say only unintentional errors.

11   Really, kind of flip it on its head to say well, unintentional

12   errors, those are -- those can be reversed.  But if you intend

13   to make an error, well, we can't reverse those.  That just --

14   I don't think that makes -- that makes much sense.

15        I do want to respond to a couple other points, your

16   Honor.  One is that we are trying to blame the shareholders.

17   We're not trying to blame the shareholders.  That's not what

18   we're doing.

19        What we're trying to say is the shareholders -- the

20   harm -- the alleged harm is not -- that's not in front of the

21   Court today.  Counsel might suggest that all of these other

22   firms are going to go after their customers.  Well, the truth

23   of the matter is, 66 of them haven't objected.  So we don't

24   know.  But we can infer that they don't have this problem

25   because if you're going after your customers and PR issue,

1      boy, that's a problem.  So if they think they've got to go

2      after their customers, you'd think they'd be objecting here

3      today.  They're not.  They're not.  They understand the rules

4      of the game.  They're abiding by the rules of the game.

5      That's why we think they're not objecting here today.  They

6      all received notice.

7          A couple points on the shareholder point, though, that I

8      didn't touch on in my opening but I think is relevant.

9          Two things.  The first is, if -- by reversing the

10     dividend, there will be a fund that will go to the Calissio

11     estate, potentially several hundred thousand dollars or more.

12     To that fund can be applied -- creditors could put that into

13     bankruptcy, there could be applied claims, shareholders if

14     they thought they had a remedy, TD Ameritrade if they thought

15     they had a remedy, anyone else could go to Calissio and try to

16     get from that fund.  If it's reversed, there will be a fund.

17         Secondly, any of the funds that go back to COR Clearing,

18     my client is not going to provide those directly to their

19     customers.  They're going to hold them in escrow to hold

20     against any potential claims from customers of TD Bank or

21     anyone -- or TD Ameritrade or anyone else, just as a

22     safeguard, as a precaution.

23         COR Clearing is not going anywhere.  If COR Clearing did

24     something wrong, there's a legitimate claim against COR

25     Clearing or their customers -- or their customers, not COR

1    Clearing, we're going to hold that fund and apply that against

2    any potential proceeds that might -- we don't think there

3    needs to be, but we're going to do it out of an abundance of

4    caution.

5         At the end of the day, Judge, there is the core issues.

6    There was some suggestion that they're hotly disputed.

7    There's no evidence -- everything in the record suggests that

8    this was an error.  They admitted it in their brief.  It was

9    an error.

10        They might suggest that they haven't had discovery of

11   Calissio, maybe it's not a fraud.  It's an error.  That's

12   enough.  That's enough.

13        The application of the DTC rule, they suggest that maybe

14   it doesn't apply the way we suggest it applies.  That's a

15   question for DTC.  And if they agree with them, well then

16   they'll just ignore the letter and the receiver will be done,

17   and there will be no -- there will be no action taken.

18        And there's no dispute that after that 90-day period

19   lapses, that money is gone from -- for COR Clearing and

20   Alpine.  It is gone.  It is gone.

21        So -- one moment, your Honor.

22        (Off-the-record discussion had.)

23        MR. HILGERS:  With that, your Honor, we don't

24   think -- there's no suggestion that there's any evidence on

25   those core points.  I don't think any testimony is needed.

1    Certainly whatever the Court would like to do, we're happy to

2    do.  But we think the record on those issues are discrete,

3    uncontested and --

4            THE COURT:  I don't have a lot of time on this, you

5    know.  And whether the evidence will help me or hurt me, I

6    don't know.  But I want to be sure that we have everything we

7    need to have.  You may disagree with what we need to have.  He

8    may disagree with what I think we need to have.  But I'm going

9    to give him the opportunity to put on the evidence.  And if

10   you want to follow with some of your own, you may do so.

11       But how long is this going to take?

12           MR. HARGENS:  I don't imagine, collectively with the

13   two, more than an hour, Judge.

14           THE COURT:  Does that include cross-examination?

15           MR. HARGENS:  I'm assuming Mr. Hilgers isn't going to

16   have much -- but no, it doesn't.

17           THE COURT:  It does include --

18           MR. HARGENS:  It does not include cross.

19           THE COURT:  You say you're going to take an hour to

20   put it on?

21           MR. HARGENS:  A total between the two.  I'm guessing,

22   but I think that's probably a fair guess.

23           THE COURT:  I'll hold you to a half hour on each of

24   them.

25           MR. HARGENS:  Thank you, your Honor.

 1          Your Honor, I'd call Carlos Salas to the stand.  May I

 2     inquire sitting down or do I need --

 3          THE COURT:  You can sit.

 4          MR. HARGENS:  Thank you.

 5          THE COURT:  Right here.  She has all the power.

 6          COURTROOM DEPUTY:  Would you please state your full

 7     name spelling your first and last name for the record.

 8          THE WITNESS:  Carlos Pedro Salas, C-a-r-l-o-s

 9     P-e-d-r-o S-a-l-a-s.

10          CARLOS SALAS, TD AMERITRADE'S WITNESS, SWORN

11          THE COURT:  You'll have to come clear around to the

12     back.  Pull that microphone around so that...

13          All right, Mr. Hargens.  You may proceed.

14                         DIRECT EXAMINATION

15     BY MR. HARGENS:

16     Q.   Mr. Salas, you are the chief executive officer of COR

17     Clearing, LLC, the plaintiff in this action; is that correct?

18     A.   Yes.

19     Q.   And in connection with the motion for appointment of a

20     receiver that we're before the Court on today, you submitted a

21     declaration under penalty of perjury, correct?

22     A.   Yes.

23     Q.   I want to call your attention to a couple of sections of

24     that.

25          MR. HILGERS:  Your Honor -- do you have a copy for

```
 1    the witness?

 2              MR. HARGENS:  I don't, but I'm going to tell him

 3    specifically what he said and just follow up.

 4              THE COURT:  All right.

 5              MR. HILGERS:  Judge, I may have a copy for the

 6    witness.

 7              MR. HARGENS:  I can give him a copy if -- there's one

 8    in my notebook.

 9              THE COURT:  Do you have a copy?

10              MR. HILGERS:  Let me see if I do.  I should.

11              THE COURT:  I've got enough paper.  I'm sure I do,

12    but I don't have it up here.

13              MR. HARGENS:  I've got one, Judge.  I can give it to

14    him.  I just need to find it.

15         (Off-the-record discussion had.)

16    BY MR. HARGENS:

17    Q.   Mr. Salas, I've handed you what was the declaration --

18              THE COURT:  Did you mark it as an exhibit?

19              MR. HARGENS:  Oh, sorry.  May I approach?

20              THE COURT:  Why don't you approach him and...

21              MR. HARGENS:  Sorry, I need to take that.

22              THE COURT:  Hand it to Tiwauna.

23         What number did you give it?

24              COURTROOM DEPUTY:  101.

25              THE COURT:  101.
```

 1              All right.  You may inquire.

 2                   MR. HARGENS:  Thank you, your Honor.

 3       BY MR. HARGENS:

 4       Q.   Mr. Salas, you've been handed what's been marked as

 5       Exhibit 101 for hearing today.  And I'd like -- which is the

 6       declaration that was filed in this case on October 5th of

 7       2015.

 8              Would you turn to paragraph 11 of the declaration.  Are

 9       you there, sir?

10       A.   I am.

11       Q.   Okay.  You state there that COR's records reflect that

12       between July 29th of 2015 and August 19th of 2015 -- and I'll

13       abbreviate -- Nobilis, through its broker Darbie, a customer

14       of COR, obtained over 327 million shares of stock in Calissio

15       through a conversion of debt to equity.

16              Did I paraphrase that correctly?

17       A.   Yes.

18       Q.   What records of COR reflect what you state there?

19       A.   Well, we have extensive records of shares that are

20       deposited with us to clear.

21       Q.   How do you know that there was a conversion of debt to

22       equity that resulted in those 327 million shares?

23       A.   That's a good question with an involved answer.

24              We have -- as a corresponding clearing firm, we have

25       certain obligations, regulatory obligations to do a heightened

1    review on deposits of securities that will be sold into the

2    market.

3         And so where you have a situation such as this where you

4    have shares whose provenance is a conversion of a debt

5    instrument, we have a legal and compliance staff that does a

6    fairly extensive review of the note; of the purchase price

7    paid for the note; records that the price was, in fact, paid;

8    assurances that all of the appropriate approvals were

9    received, including, for example, FINRA, our industry

10   regulator's approval.  So FINRA, for example, approves all

11   corporate actions, such as dividends, for over-the-counter

12   issuers.

13        So in our case, we have a fairly thick file that shows

14   the extent of the review that was done on this conversion,

15   which is basically you would have the original documents or

16   copies of them.  You'd have, you know -- if appropriate, you'd

17   have wire instructions or checks.  And you would have a number

18   of attestations from the issuer.  And of course, you would

19   have the record of FINRA's approval of the dividends.

20             THE COURT:  Who is doing this review that you've just

21   been --

22             THE WITNESS:  So your Honor, we have a department

23   that's composed of -- I think it's three full-time employees,

24   plus a compliance staff of about 12 others, who are involved

25   in this review.

1          And what we do -- there's a -- there's a regulatory

2     guidance by FINRA called Notice to Members 09-05.

3          And what it asks the member firms to do is to do a legal

4     review of deposits such as this to ensure that they are either

5     registered or are eligible for an exemption from registration

6     to avoid taking part in an illegal distribution.

7          And so this is a process we do for all of our deposits,

8     all the deposits that we approve for sale.  It's something

9     that is time-consuming and expensive for the clients, but is

10    generally pretty thorough.

11    BY MR. HARGENS:

12    Q.   So as part of what you referred to as this heightened

13    review, your team would certainly look at the terms of the

14    debt instrument that was going to be converted to common

15    stock, correct?

16    A.   I think they would.  I think they would look to ensure

17    that the common shares being deposited match the terms.

18    Q.   And what type of debt instrument was this?  I think you

19    referenced in your testimony a note.  Was it a note versus a

20    bond, do you know?

21    A.   I don't have personal knowledge.  I think it was most

22    likely a private note.

23    Q.   Okay.  And have you personally reviewed the terms of the

24    note?

25    A.   No.  I have very competent people that do that on behalf

 1   of the firm.

 2   Q.   Okay.  Well, did your very competent people look at the

 3   terms of the note to see if it had any restrictions in it on

 4   converting debt to equity during the period between a record

 5   date and an ex-dividend date of a previously announced

 6   dividend?

 7   A.   I have no way to answer that.  I don't know.

 8   Q.   That wouldn't be unusual, would it, sir, to have

 9   something in a debt instrument that would say -- to address

10   this very situation we're dealing with here today -- that you

11   can't convert debt to equity during that time period because

12   of the chaos it would create in tracking a previously

13   disclosed dividend.  That wouldn't be unusual, would it, sir?

14   A.   I don't have personal knowledge of how those provisions

15   would work.  That's not my area of expertise.

16   Q.   Okay.  Did anybody on your team review the note to see

17   if, under the terms of the note, stock that was converted --

18   excuse me, debt that was converted to stock -- let me start

19   over.

20        Did anybody look at the terms of the note to determine

21   whether the note provided that stock that would be issued

22   pursuant to a conversion would be eligible for previously

23   declared dividends?

24   A.   Could you --

25             THE COURT:  Do you know whether anybody did that?

1    Not whether they were supposed to or not, I'm not interested

2    in that.

3    A.   I don't know personally.  I did review that the customary

4    checks were applied with.  When I say the customary checks, we

5    are examined by FINRA each year.  One of the areas they look

6    at is our processes for this type of approval.  So I know that

7    those were done.  I don't know the specifics, I haven't read

8    the note.

9    BY MR. HARGENS:

10   Q.   So you don't know -- you personally don't know if the

11   note provided that the 327 million shares that were issued

12   pursuant to the conversion, in fact, were eligible for the

13   previously disclosed dividend.  Isn't that true?

14   A.   I have no personal knowledge of the note.

15   Q.   All right.  You state at the end of -- well, strike that.

16        There was also a conversion from debt to equity by the

17   company called Beaufort, correct?

18   A.   Correct.

19   Q.   And that's -- Beaufort is referred to in paragraph 12 of

20   your declaration, correct?

21   A.   Yes, I see it in there.

22   Q.   Okay.  And I think we have to fast-forward in your

23   declaration.  I'll see if I can find it.  But my recollection

24   is that you indicated that Beaufort converted 90 million

25   shares of debt to equity in Calissio; is that correct?

1    A.   If that's what it says, it's correct.  I don't have it in

2    front of me.  I don't remember the number.

3    Q.   You indicate in paragraph 12 of your declaration that

4    Nobilis sold its shares for, quote, only $700,000.  Do you see

5    that?

6    A.   I do.

7    Q.   Why do you say only $700,000?

8    A.   Well, only 700,000 because the liability they created for

9    themselves through this process was much greater than that.

10   Q.   You're not suggesting that they sold it for a low price

11   given the market conditions?

12   A.   I'm not sure I understand your question.

13   Q.   Well, let me ask you this:  How do you know they sold the

14   converted shares -- I'll call them the converted shares, okay?

15    -- for $700,000?

16   A.   Because they would have received proceeds for the sales

17   that we would have in their account at our firm.

18   Q.   So Nobilis was a customer of COR?

19   A.   Nobilis is a customer of our introducing firm,

20   J.H. Darbie.  J.H. Darbie has a clearing contract with us.  So

21   we do settlement and custody for J.H. Darbie and its

22   customers.

23   Q.   What, if any, relationship is there between Darbie and

24   COR other than what you just described?  Is there any

25   affiliation by common ownership, for example?

1   A.   No.  Our relationship, I think, is limited to a clearing

2   agreement that provides for our provision of services for

3   clearing and custody to Darbie.

4   Q.   Was Nobilis aware that the stock that had been converted

5   from debt to equity was not eligible for the dividend?

6           MR. HILGERS:  Objection, your Honor, calls for

7   speculation.

8           THE COURT:  Yup.  There's no jury present.  I

9   understand your objection.  I'll let him answer the question.

10  A.   Well first, I don't know what Nobilis was aware of or

11  not.  But I would find it strange that they would sell for

12  $700,000 a stock that would bring with it a debit in the

13  millions.

14      In other words, it makes no sense for Nobilis to have

15  known that a dividend would, you know -- a due bill would

16  accrue here, given the price that they sold it at.

17  BY MR. HARGENS:

18  Q.   But other than that -- you've never had any discussions

19  with Nobilis, for example, to determine whether they knew that

20  this qualified for a dividend or not?

21  A.   No, I have had discussions with Nobilis.  And they claim

22  not to have known that it qualified for a dividend.

23  Q.   Okay.

24  A.   And I don't believe it does, by the way.

25  Q.   Have you made any claim against -- you, when I say you,

1    COR -- has COR made any claims against Darbie as a result of

2    this conversion of debt to equity or the subsequent sale of

3    the shares that were issued as a result?

4    A.   Yes, in the following sense:  We approached Darbie with

5    this.  They understood their liability to our firm for

6    indemnification against errors or any losses caused by their

7    activity or customers' activity.

8         And so Darbie paid to our firm a half million dollars in

9    exchange for which I permitted -- or the firm permitted the

10   remaining unsecured debit balance to be owed to us by Darbie

11   in the form of an unsecured -- excuse me -- yeah, an unsecured

12   but a subordinated note.

13   Q.   Okay.  So there was an agreement between Darbie and COR

14   whereby Darbie paid COR $500,000, first of all, correct?

15   A.   Correct.

16   Q.   And then there's a subordinated note from Darbie to COR

17   in the amount of how much?

18   A.   1.2 million -- or thereabouts, about 1.2 million.

19   Q.   And so collectively that's roughly $1.7 million; is that

20   right?

21   A.   Correct.

22   Q.   And is it just a coincidence that that matches up with

23   the $1.7 million that I heard Mr. Hilgers mention earlier as

24   the amount that you guys believe was paid in dividends to

25   Calissio?

1    A.    That is a coincidence.  I think Mr. Hilgers derived his

2    number by reviewing Calissio's public pronouncements regarding

3    the number of shares that they repurchased.

4         But I can explain to you how the 1.7 at Darbie came to

5    be.

6    Q.    You anticipate my next question, sir.  Please explain how

7    you came up with the 1.7.

8    A.    So -- and again, I don't have all the numbers in front of

9    me.  But roughly speaking, let's say it's a $4 million debit

10   that was taken from COR Clearing's account on behalf of these

11   customer activities.

12        We have indemnification agreements with customers and

13   with our introducing brokers so that COR, as a clearing and

14   settlement firm, is indemnified against the actions of, again,

15   customers and brokers.

16        And so in this case, what happened is we immediately

17   froze the customers' accounts.  They had other assets in those

18   accounts.  I think the majority were probably sale proceeds

19   from the Calissio shares that they sold.

20        We took those assets in satisfaction -- in partial

21   satisfaction of our indemnification rights against our

22   customers.  And that left a remaining balance that I believe

23   was 1.7.  And I'm trying to think if there were other things

24   that -- I think that was the math of it.

25        So in other words, we exercised, you know, our

1     established right of self-help and indemnification against the

2     remaining assets in these accounts.  And then the uncovered --

3     the unsecured debit, if you will, that remained, we imposed on

4     J.H. Darbie and did it through a partial cash payment, and

5     then a subordination of our remaining rights against Darbie

6     suborbing any below their other creditors and customers.

7     Q.   Just so I understand, did you exercise similar rights

8     that you did with respect to Darbie regarding the other -- I'm

9     ballparking it -- $2.3 million of the $4 million credit

10    against other introducing brokers like Darbie?

11    A.   Can you repeat or rephrase the question?

12    Q.   I'll try.

13         As you've described it, you exercised self-help with

14    respect to Darbie, right?

15    A.   No.  Our -- we negotiated with Darbie because we didn't

16    have enough assets of Darbie on hand to do that, yeah.

17    Q.   Okay.  Did you have similar agreements with any other

18    entities other than Darbie?

19    A.   Well, it depends a little bit what you mean.  We have

20    very similar agreements in place with all our introducing

21    firms.  I'm not aware that any of our other introducing firms

22    were either on the debit or credit side of this equation, of

23    this instance.

24         THE COURT:  By this equation, you're talking about

25    this transaction?

 1            THE WITNESS:  The Calissio transaction, yes, your

 2     Honor.

 3     BY MR. HARGENS:

 4     Q.   Sir, I want to shift gears for a minute.

 5            Assuming that the stock -- the three hundred and -- well,

 6     I believe that the total number of shares -- and I think the

 7     record will reflect, I won't ask you to agree on this, but I

 8     believe the total shares between Calissio -- excuse me,

 9     between Nobilis and Beaufort that were issued as a result of

10     the conversion approximates 475 million shares.  And I'd just

11     ask you to assume that for me.

12            But, assuming that those shares were not eligible for the

13     previously declared dividend -- which I understand is COR's

14     position in this case -- as there is activity in that stock

15     between the record date and the ex-dividend date, how is DTC

16     supposed to know that?

17     A.   Are you asking how would they know that there were

18     deposits of new shares coming in?

19     Q.   No.  How would they know that the shares being traded by

20     Nobilis and Beaufort were, in fact, not eligible for the

21     dividend?

22     A.   Well, I think you've identified the crux of the issue

23     with DTC's process.

24            So it's, first of all, unusual that you would have a

25     period between the record date, which establishes which shares

 1    are eligible for a dividend, and the ex-dividend date that, in

 2    this case, is 45 days later, which establishes which parties

 3    that have been purchasing shares are eligible for the transfer

 4    of that dividend.  So that's unusual in the first case.

 5        And I think the problem that DTC has and the reason that

 6    it did what it did in this case and debit our accounts is that

 7    DTC holds common shares of any specific issuer unless they're

 8    issued in a different tranche or, you know, are preferred

 9    shares or something else, they hold them in a common bin, if

10    you will, under a CUSIP number.

11        And so DTC has a problem that despite the legal fact that

12    shares that were not in existence after the record date are

13    not entitled to a dividend, they have a practical limitation

14    in that they can't distinguish by the ex-dividend date who

15    bought which shares.

16        So it's an imperfect system.  DTC does the best it can in

17    the sense that it just pays the dividend out on all the

18    shares.  But that's why it provides for this clawback

19    mechanism where if there is a manifest error or an inequity,

20    there's a very simple way to redress it.

21    Q.   So back to my question.  Is there any way for DTC to

22    determine, as it's tracking interim activity between a record

23    date and an ex-dividend date, whether a particular share of

24    stock does or does not qualify for a previously declared

25    dividend?

1    A.   I don't believe they do.  I believe that there certainly

2    are things they could do to identify shares by issuance date.

3    But I don't believe that's practically what they do.

4    Q.   Did -- well, COR knew at the time of this conversion that

5    the stock that was being issued was not eligible for a

6    dividend; isn't that right?

7    A.   Yes, that's factual.  Right.

8    Q.   Did COR take any action to alert DTC that there was some

9    400-plus million shares of stock being dumped on the market

10   that was not eligible for a dividend?

11   A.   No.  I think that would be the role of the transfer

12   agent.

13   Q.   And the transfer agent here is Signature Stock Transfer,

14   Inc., correct?

15   A.   Correct.

16   Q.   And COR has sued them because COR believes that Signature

17   Stock Transfer, Inc. was part of the fraud perpetrated by

18   Calissio.  Isn't that right, sir?

19   A.   Yes.

20   Q.   If Judge Strom were to grant the relief requested today

21   and a receiver is appointed with directions to notify DTC that

22   Calissio wants the entire dividend credit and debit process

23   reversed, and as a result COR is credited $4 million, is COR

24   going to give Darbie its half million dollars back and cancel

25   that note?

SALAS - DIRECT                                                    55

1    A.   That's also a very good question.  I'm happy to address

2    it.

3         What we will do if we receive a return of the proceeds is

4    we will withhold from the customers -- from Nobilis and

5    Beaufort -- the amount of the sale proceeds they received in

6    the sale of those shares.

7         And so what will happen is we will not return to them the

8    assets that we sought in indemnity because we would anticipate

9    that there's a likelihood or a possibility of other customer

10   claims; maybe your customers, for example, would seek a

11   complaint against, you know, Nobilis.  And typically when that

12   happens, they would go against Nobilis and Darbie and COR.

13        And so we would retain those assets because we would

14   anticipate that there would be customers coming after them.

15   Q.   Has COR frozen the accounts of Nobilis and Beaufort?

16   A.   Yes.  We did that day one.

17   Q.   How much is in those accounts?

18   A.   I don't have the numbers at hand, but it's -- I think

19   it's the balance between, you know, the 1.77 and the 3.7, so

20   it's probably -- I think it's between 1.4 and $2 million.

21   Q.   And that's in addition to the amount represented by the

22   Darbie payment and note; is that right?

23   A.   Yes.  And again, I'm not prepared for this testimony, but

24   I think that's right.  I mean, I think basically what we did

25   is we took the amount that we were out, we reduced our

1     exposure by taking the proceeds and assets from the Nobilis

2     and Beaufort accounts, and then we negotiated with Darbie

3     their indemnification of the remaining exposure.

4     Q.   Why did you freeze the accounts of Nobilis and Beaufort?

5     A.   Well, we froze them primarily because we have a right to

6     assets in those accounts in the event that they cause us a

7     loss.  And so they caused us a loss.

8     Q.   How did they cause you a loss?

9     A.   Because sales that originated with them have resulted in

10    DTC taking our money and spreading it around the street.

11          MR. HARGENS:  Your Honor, may I have just a moment to

12    confer?

13        (Off-the-record discussion had.)

14          MR. HARGENS:  I have no further questions.

15          THE COURT:  Any cross?

16          MR. HILGERS:  Just briefly, your Honor.

17                              CROSS-EXAMINATION

18    BY MR. HILGERS:

19    Q.   Mr. Salas, I believe you testified that COR Clearing

20    froze the accounts of Nobilis and Beaufort; is that right?

21    A.   Correct.

22    Q.   Did either of those entities agree with your decision to

23    freeze their accounts?

24    A.   No, on the contrary.

25    Q.   What do you mean by that?

1    A.    They both filed arbitrations against COR.

2    Q.    I believe you also testified that you would hold -- COR

3    would hold some money in reserve for any potential customer

4    complaints.  Is that accurate?

5    A.    Yes, but let me be clear about it.  We will hold -- all

6    the money that we took -- we took from those accounts, we are

7    not going to repay and have no obligation to repay Nobilis or

8    Beaufort until it's clear that we have no further need for

9    indemnification.  I think as it stands right now, very clearly

10   there's the threats, if not the reality, of folks seeking that

11   money.

12   Q.    If it turns out that there is no need for

13   indemnification, what will happen to those funds?

14   A.    If there is no need for indemnification, if everything

15   settles out or is cleared, then they would be released back to

16   them.

17   Q.    In light of -- there's been some testimony regarding some

18   assets that have been frozen, some indemnification rights, a

19   note.  If the Court does not grant the receiver, will COR

20   Clearing be made whole?

21   A.    No.  I think it's exceedingly unlikely.

22   Q.    Why do you say that?

23   A.    We have a judgment against one entity that I think we

24   know to a certainty is insolvent, which is Calissio, and

25   another entity that, from our experience in the market, is

1    unlikely to be solvent, the transfer agent.

2        Transfer agents are typically very small mom-and-pop

3    businesses that don't have the requirements to hold capital

4    that firms like mine have.

5    Q.   When did you learn about the dividend that was issued --

6    I'm sorry, the due bills that were attached to the Nobilis and

7    Beaufort shares?

8    A.   We learned about them essentially the day of -- or the

9    day before the dividend payments were made by DTC.

10       And the reason for that is DTC provides you some tools

11   for visibility and activity in your account, but the only one

12   that has any lead time associated with it is a forecast of

13   your cash balance.  And that only goes out seven days.

14       And so, you know, I surmise that operations saw that the

15   cash balances changed during that period, but we settle a

16   large number of transactions.  So it's not the type of thing

17   that would jump out at you.

18       And we'd had discussions with DTC about better tools, but

19   they tell us this is as much as you can get.

20   Q.   What did you do after you found out about the ineligible

21   dividends?

22   A.   Well, we immediately engaged with DTC.  We informed them

23   that they'd made a manifest error.  And that's where we began

24   the discussion with DTC regarding, you know, their inability

25   to act without an instruction from the issuer.

1          But we also demanded that DTC do two things:  One is

2     provide us the identity of the other member firms that had

3     received the credits for the dividend so that we could notify

4     them so that they could hold those assets and prevent losses.

5     And we also demanded that DTC notify them.

6          So I know that notifications went out.  They went out a

7     few days later.  And we took the list of notifications that

8     they sent and followed up on our own.

9          I also went and met with the Securities and Exchange

10    Commission in Washington to describe to them my concerns about

11    what had happened here, both with respect to Calissio and with

12    respect to this very novel fraud on the DTC system.

13    Q.   We showed on the screen earlier that there was the DTC

14    Distribution Service Guide.  Do you recall that?

15    A.   Yes.

16    Q.   Have you seen that before?

17    A.   Yes, I have seen that.  Yes.

18    Q.   And you saw the language about the 90-day post payable

19    allocation correction language that we showed?

20    A.   Yes.  I've seen that language and discussed it with DTC.

21    Q.   And what is your understanding of DTC's view of how that

22    language should be applied in this instance?

23              MR. HARGENS:  Objection, hearsay.

24              MR. HILGERS:  I'm just asking for his understanding.

25              THE COURT:  Overruled.  He may answer.

1    A.   DT- -- that language -- a couple things.  I think we

2    noted that language.  We discussed it with DTC.  We

3    interpreted it initially to permit the transfer agent to

4    initiate a reversal of the dividends.

5         DTC disagreed.  They did point us back to the language

6    though and suggested to us, as we were pressing DTC to fix

7    this error, that they would abide by an instruction from the

8    issuer or a receiver for the issuer to make that change.

9         And I think the language is very important to DTC because

10   of where they sit in the marketplace.  They settle trillions

11   of dollars of transactions.  They seem to me to be very

12   concerned about setting a precedent that they need to exercise

13   any sort of discretion or judgment in evaluating whether their

14   system has functioned correctly.

15        And so their zone of comfort is to have clear

16   instructions from third parties to take any action.  And so

17   this process was pointed to us by DTC as the most appropriate

18   way to proceed.

19   Q.   And when you say "this process", are you referring to a

20   limited purpose receiver?

21   A.   Yes.

22   Q.   Who generally bears the responsibility for a customer's

23   loss?

24              MR. HARGENS:  Objection, legal conclusion.

25              THE COURT:  Are we -- I don't have any time past noon

 1    so...

 2              MR. HILGERS:  I only have a couple -- I have about

 3    three questions left, Judge, and then I'll pass the witness

 4    back.

 5              THE COURT:  We've got to finish everything this

 6    morning.

 7              MR. HILGERS:  I understand.

 8              THE COURT:  Okay.

 9    A.   I'm sorry, who bears the --

10    BY MR. HILGERS:

11    Q.   Who bears responsibility for a customer's loss?

12    A.   Well, in the first instance, the customer.  But there are

13    certainly situations where a customer experiences a loss

14    because there was a regulatory deficiency or a fiduciary

15    deficiency at his brokerage.

16         So, for example, if Ameritrade were to basically

17    determine that one of its customers didn't have the

18    suitability, didn't have the experience, the liquidity, the

19    risk appetite to speculate in penny stocks and they bore a

20    loss, then the customer may have a claim against Ameritrade.

21    Q.   Just briefly, just to finish up, we looked at your

22    declaration a little earlier.  Do you recall that, sir?

23    A.   Yes.

24    Q.   Looking at paragraphs 11 and 12 and having them in front

25    of you now, is there anything -- well, strike that.

```
 1              Did you review -- before submitting that declaration, did

 2       you review COR Clearing's records as it related to those

 3       paragraphs 11 and 12?

 4       A.   Oh, yes.  I mean, I reviewed -- I had extensive

 5       discussions with the staff who was involved in this.  I

 6       received descriptions about what they'd done.  And I'd seen

 7       certainly some of the records that support these statements,

 8       of course.

 9       Q.   And paragraphs 11 and 12, and in fact, your whole

10       declaration, were those based on your personal knowledge and

11       review of COR Clearing's records?

12       A.   They were based on my knowledge and review of the records

13       that were shown to me by my staff and my interviews with the

14       staff who was primarily responsible for these things, yes.

15              MR. HILGERS:  Pass the witness, your Honor.

16              THE COURT:  Mr. Hargens?

17              MR. HARGENS:  No further questions, your Honor.

18              THE COURT:  You may step down.

19              MR. HARGENS:  Your Honor, I call Chad Johnsen to the

20       stand.

21              THE COURT:  We have to leave some time for your

22       adversary over here.

23              MR. HARGENS:  Yes, your Honor.

24              THE COURT:  So I'll give you about ten minutes with

25       him and no more.
```

 1              MR. HARGENS:  I'll take whatever I can get.

 2              COURTROOM DEPUTY:  Would you please state your full

 3     name, spelling your first and last name, for the record.

 4              THE WITNESS:  Chad Ryan Johnsen, C-h-a-d

 5     J-o-h-n-s-e-n.

 6              CHAD JOHNSEN, TD AMERITRADE'S WITNESS, SWORN

 7              MR. HILGERS:  Your Honor, before he begins the

 8     examination, we have the exhibit from the witness.

 9         Tiwauna, do you -- may I approach?

10              THE COURT:  Yes.

11         You may proceed.

12              MR. HARGENS:  Thank you, your Honor.

13                           DIRECT EXAMINATION

14     BY MR. HARGENS:

15     Q.   Mr. Johnsen, are you employed?

16     A.   Yes.

17     Q.   Where are you employed?

18     A.   TD Ameritrade Clearing.

19     Q.   And what is your position there?

20     A.   I'm a senior manager of global corporate actions.

21     Q.   How long have you been employed by TD Ameritrade?

22     A.   Just over ten years.

23     Q.   Can you describe briefly for the Court what your

24     responsibilities have been in your current position, which I

25     understand you've held for roughly six years; is that right?

1      A.   Correct, yes.

2           For the last six years, I've been a senior manager of

3      global corporate actions.  I oversee multiple teams that deal

4      with the processing of reorganization events, as well as

5      dividends, distributions, interest payments, and the like.

6      Q.   Okay.  And you submitted a declaration in this case in

7      opposition to COR's motion for appointment of a receiver,

8      correct?

9      A.   Correct.

10     Q.   In the course of your employment, are you familiar with

11     the process that a clearing company like COR or in the case of

12     TD Ameritrade's affiliated clearing company, TD Ameritrade

13     Clearing, undertakes in the event of a issuance of stock as a

14     result of a conversion of debt to equity?

15     A.   Yes, I'm familiar with that.

16     Q.   Okay.  Can you describe for us the process that a company

17     in the position of TD Ameritrade Clearing or COR would

18     normally go through to conduct investigation in connection

19     with a debt-to-equity conversion?

20     A.   Yes.  Typically there's going to be a prospectus for the

21     notes.  And there may be a supplemental prospectus that would

22     step through the terms of a conversion.  A debt-to-equity

23     conversion or debt-to-anything conversion, there would be

24     terms for that.

25          A client that has the beneficial ownership of those

1     notes, that actually owns them, would provide an instruction

2     that they wanted to convert or exercise their conversion

3     rights.

4          And then the firm typically would review that information

5     to see what the terms are and if they can provide an

6     instruction to the transfer agent or to whom can actually

7     affect that transaction for their client.

8          There would be a transfer of the notes to a transfer

9     agent or somebody who is able to affect that transaction and

10    then a transfer of common stock back in on a conversion.

11    Q.   Okay.  Would a part of the process be what Mr. Salas had

12    described to review the terms of the debt instrument to

13    determine what, if any, impact it had on eligibility of the

14    stock for any outstanding declared dividends?

15    A.   Yes.

16    Q.   What would be done in that regard?

17    A.   Well, typically in the prospectus or a supplemental

18    prospectus there's going to be a clause that will state how

19    that type of situation should be handled.

20         So the conversion terms may state that between record

21    date and payable date of a div event, no conversions are

22    possible, for example.  Or they might state that if you

23    convert between record and payable, that you'll be treated as

24    a record date holder and paid the distribution.

25         Or they may state that if you convert between record and

1    payable date of an event, that's -- the conversion terms would

2    be updated or amended to account for the fact that there's

3    been a distribution on the common stock.

4    Q.   Is it unusual -- let me state -- is there anything that

5    would prohibit the terms of the note to provide that stock

6    that's issued in connection with a debt-to-equity conversion

7    would be eligible for a previously declared dividend?

8    A.   I don't think I quite follow that.

9    Q.   Okay.

10   A.   Sorry.

11   Q.   Well, is -- would it be unusual or inappropriate for the

12   terms of the note or other debt instrument to provide that

13   stock that is going to be issued as a result of the

14   conversion, even though it's issued after the record date of a

15   previously declared dividend, would nevertheless be eligible

16   for the dividend?

17   A.   That is possible, yes.

18   Q.   And we've not seen the terms of whatever debt instrument

19   or instruments were held by Nobilis or Beaufort that were,

20   according to the position of COR in this case, converted.

21   Isn't that true?

22   A.   That is correct.

23   Q.   So we don't know at this point what, if any, provisions

24   might have been in there regarding whether these dividend --

25   or the stock that was apparently sold by Nobilis and Beaufort

1   in the weeks leading up to the ex-dividend date did or did not

2   qualify for the dividend.  Is that true?

3   A.   Correct.

4   Q.   How can DTC track during this interim activity period

5   whether a particular stock is eligible or isn't eligible for a

6   previously declared dividend?

7   A.   They have no means of doing so.

8   Q.   Does that concern you?

9   A.   No.

10  Q.   Why?

11  A.   It's complex to explain, but essentially DTC has the

12  mechanisms in place to track that trading that occurs between

13  record and payable, to move funds from participant to

14  participant based on, you know, the buying and selling

15  activities.

16       And any other shares that are introduced to that system,

17  you know, DTC has spelled out very clearly in their

18  Distribution Guide how those are handled.

19  Q.   And you're familiar with the terms of DTC's Service

20  Guide, are you not?

21  A.   I am.

22  Q.   Based upon that familiarity, did DTC do or not do

23  anything with respect to the Calissio shares in issue here

24  that's specified in the Guide?

25  A.   In my view, they handled them exactly as they should have

1     been handled pursuant to their Distribution Guide.

2     Q.    Sir, as part of your declaration, you provided some

3     numbers to the Court regarding the number of accounts that had

4     transacted in Calissio stock that received credits for the

5     dividends that are in issue here, the amount of those credits,

6     and the amount that TD Ameritrade stands to lose in the event

7     that it does reverse those credits and is forced to go collect

8     amounts that aren't in the accounts.  Do you recall that?

9     A.    Yes.

10    Q.    Have you updated those numbers since your declaration was

11    submitted?

12    A.    Yes.

13    Q.    And can you just tell the Court what the number of

14    accounts is, the number of the total dividends, and then the

15    amount that TD Ameritrade may be forced to go collect from

16    clients because they don't have funds in the account to

17    reverse at this point?

18    A.    Certainly.  I believe the total number of accounts is

19    764, if I recall correctly.  The total funds originally

20    distributed were approximately 934,000.

21        And as of, I believe, yesterday, were TD Ameritrade to

22    reverse that distribution, there would be unsecured, in other

23    words, clients that don't have those funds in the account any

24    longer, in the amount of approximately $220,000.

25              MR. HARGENS:  No further questions, your Honor.

 1             THE COURT:  Any cross?

 2             MR. HILGERS:  Yes, your Honor, just a few questions.

 3        (Off-the-record discussion had.)

 4                      CROSS-EXAMINATION

 5   BY MR. HILGERS:

 6   Q.   Do you know -- you just referenced your review of the

 7   records of TD Ameritrade's customers and their share

 8   transaction activity.  Do you know how much your customers

 9   paid for the shares of Calissio stock that they purchased?

10   A.   I do not.

11   Q.   You spoke about a prospectus.  Do you recall that

12   testimony?

13   A.   Yes.

14   Q.   A prospectus is involved with a bond; isn't that right?

15   A.   Correct.

16   Q.   You wouldn't have a prospectus for a note, correct?

17   A.   Note and bond are somewhat synonymous terms.

18   Q.   Well, those are two different things, aren't they?

19   A.   They can be used very interchangeably in my experience.

20   Q.   A private note not issued to the public is not equivalent

21   to a bond, correct?

22   A.   Correct.

23   Q.   You understand that the record date here is June 30th,

24   2015, right?

25   A.   Yes.

1    Q.   And any share issued after that record date is ineligible

2    for a dividend, correct?

3    A.   No.

4    Q.   Why?

5    A.   As I said earlier, potentially in a prospectus

6    supplement, in the event of a conversion, it could be

7    specified that shares could be treated as a record date holder

8    and eligible for dividend payment.

9    Q.   Could be.  Do you have any personal knowledge, sir --

10   A.   No.

11   Q.   -- that -- let me finish my question.

12   A.   Certainly.

13   Q.   Do you have any personal knowledge, sir, that any shares

14   issued after June 30th, 2015, after the record date, were

15   eligible for a dividend?

16   A.   I do not.

17   Q.   And you sat through Mr. Salas's testimony, did you not,

18   sir?

19   A.   Yes.

20   Q.   And you heard his description of the review of the

21   records of COR Clearing, correct?

22   A.   Yes.

23   Q.   Do you have any reason to disagree with his testimony

24   that he did not see anything that suggested those shares would

25   be eligible even after issued after the record date?

1    A.    I do not.

2    Q.    And you work for TD Ameritrade, correct?

3    A.    Yes.

4    Q.    And you have no personal knowledge how other member firms

5    are reacting to this motion to have a limited purpose receiver

6    appointed, are you?

7    A.    I'm familiar with E-Trade as we've referenced earlier.

8    Beyond that, not significantly.

9    Q.    So you don't have any personal knowledge of whether

10   those -- any of those member firms intend to collect any

11   monies whatsoever from their customers, do you?

12   A.    I do not.

13   Q.    Do you recall submitting a declaration to the Court in

14   support of TD Ameritrade's opposition to this motion?

15   A.    Yes.

16          MR. HILGERS:  I don't have a spare extra copy, but we

17   have a copy of the declaration for the screen.  I'm not going

18   to submit it as evidence, I just want to reference it for the

19   witness.

20          THE COURT:  It's on the screen.

21          THE WITNESS:  The screen is dark.  There it goes.

22          MR. HILGERS:  You see it?

23          THE WITNESS:  Yes.

24   BY MR. HILGERS:

25   Q.    What we've called out here is just the part -- the first

1    two paragraphs of your declaration.  Do you see that, sir?

2    A.   Yes.

3    Q.   Do you recall signing this declaration under penalty of

4    perjury?

5    A.   Yes.

6              MR. HILGERS:  If we could turn to page 4 and footnote

7    1, would you call that out and highlight it?

8    BY MR. HILGERS:

9    Q.   I'll read this briefly.

10         It is -- it says:  It is my understanding that another

11   broker-dealer has either restricted its clients from accessing

12   these funds or has already reversed said funds.  Removing

13   funds from client accounts absent a court order directing a

14   broker-dealer to do so is unusual and contrary to the firm's

15   policies.  Accordingly, no such action has been taken by TDA

16   at this time.

17         Do you see that, sir?

18   A.   Yes.

19   Q.   Did I read that correctly?

20   A.   Yes.

21   Q.   Do you understand the relief that my client, COR

22   Clearing, is seeking from the Court today?

23   A.   I believe so.

24   Q.   Do you understand that that relief -- that COR Clearing

25   -- strike that.

1          Do you understand, sir, that COR Clearing is not asking

2    for an order that would order your firm to take any money from

3    your customer accounts?  Do you understand that?

4    A.   Yes.

5    Q.   You were here when we showed the email from Mr. Carter on

6    August 20th.  Do you recall that?

7    A.   Yes.

8    Q.   Where he said there's a huge glitch and error.  Do you

9    recall that?

10   A.   Yes.

11   Q.   And we don't need to pull it back up, but did you see

12   when we discussed the TD Ameritrade brief where it said that

13   some of the credit -- or the credits to the member firms were

14   inappropriately given.  Do you recall that?

15   A.   I recall that.

16   Q.   Do you have any personal knowledge or reason to believe

17   that that was not an error?

18   A.   It was not an error on the part of DTC to track those

19   sales with due bills.  So I guess I don't quite understand

20   your question.

21   Q.   You'd agree with me, wouldn't you, that debiting funds as

22   part of a -- strike that.

23          You would agree with me, sir, that it's inappropriate --

24   or in error to pay money -- to pay a dividend to a share that

25   is otherwise ineligible to receive such a dividend, right?

1    A.   I don't know quite how to answer that.

2    Q.   If you don't have a right to a dividend and you receive a

3    dividend, that's an error, isn't it?

4    A.   I don't know that it can be boiled down quite that

5    simply.

6    Q.   So is the answer no or yes?

7    A.   I don't know.

8    Q.   You're not --

9    A.   They're -- may I explain?

10   Q.   Sure.

11   A.   If there's a representation made that the share qualifies

12   for a dividend, if it's trading prior to ex-date, ex-dividend

13   date on the markets, that would generally imply that there is

14   a dividend included.  So that's why I'm not quite sure exactly

15   how to answer your question.

16   Q.   Are you suggesting that COR Clearing made a

17   representation that there was a dividend included with those

18   shares?

19   A.   By selling through DTC, using DTC's settlement services

20   which tracks interim activity, in that situation, yes.

21   Q.   Are you -- you're saying that those shares should -- are

22   eligible -- even after the record date, they're eligible for

23   dividends?

24   A.   I'm stating they were represented as eligible.

25   Q.   Are there therefore eligible, sir?

1    A.    I don't know.  I've not examined terms of any note.

2    Q.    Do you have any reason to believe that they're eligible?

3    A.    I don't know.  I've not seen any terms.  So no, I do not.

4    I also have no reason to believe they're not eligible.

5         (Off-the-record discussion had.)

6              MR. HILGERS:  No further questions.

7              MR. HARGENS:  Just a quick follow-up, your Honor.

8              THE COURT:  Okay.

9                        REDIRECT EXAMINATION

10   BY MR. HARGENS:

11   Q.    In the event that the Court were to order the appointment

12   of a receiver that directs DTC to reverse the credit of 900

13   and roughly 40 thousand dollars -- 934, that was previously

14   given to TD Ameritrade Clearing, what is TD Ameritrade

15   Clearing and, in turn, TD Ameritrade going to do?

16   A.    We would unwind those funds or reverse those funds, if

17   you will, from our client accounts who were originally paid.

18   Q.    And in that fashion, what TD Ameritrade would be doing

19   doesn't sound much different than what COR has apparently done

20   with Nobilis and Beaufort if the clearing company or the

21   initiating broker incurs a loss as a result of trading in the

22   account, the clearing house and initiating broker is going to

23   reverse that transaction, right?

24              MR. HILGERS:  Objection, leading, your Honor.

25              THE COURT:  He may answer.

1      A.    Yes, that's correct.

2             MR. HARGENS:  No further questions.

3             THE COURT:  You may step down.

4        Do you have any other evidence?

5             MR. HARGENS:  No, your Honor.

6             THE COURT:  He's finished.

7        Do you have any other evidence other than what you've

8    developed?

9             MR. HILGERS:  Other than what we've developed and

10   what we've previously submitted to the Court via declaration,

11   we have no other evidence, your Honor.

12            THE COURT:  So I can consider this matter submitted.

13            MR. HILGERS:  Yes, sir.

14            MR. HARGENS:  Yes, your Honor.

15            THE COURT:  I need the time, so we'll be in recess.

16       And thank you.  I will admit that this has helped me.

17   Hopefully -- one of you will be unhappy, the other will be --

18   I wish I had some way of doing it so both of you would be

19   happy, but I haven't figured that one out yet.

20       Okay.  We're in recess.

21            (Adjourned at 10:45 a.m.)
         I certify that the foregoing is a correct transcript from
22   the record of proceedings in the above-entitled matter.

23

24       _/s Brenda L. Fauber____          December 1, 2015_
         Brenda L. Fauber, RDR, CRR              Date
25