IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| COR CLEARING, LLC, a Delaware limited liability company;<br><br>Plaintiff,<br><br>vs.<br><br>CALISSIO RESOURCES GROUP, INC., a Nevada corporation; ADAM CARTER, an individual;  SIGNATURE STOCK TRANSFER, INC., a Texas corporation; DOES 1-50,  TD AMERITRADE CLEARING, INC., a Nebraska corporation; NATIONAL FINANCIAL SERVICES LLC, a Delaware limited liability company; SCOTTRADE, INC., an Arizona corporation; and  E-TRADE CLEARING, LLC, a Delaware limited liability company;<br><br>Defendants. | **8:15CV317**<br><br><br>**MEMORANDUM AND ORDER** |

This matter is before the court on a motion for summary judgment filed by defendant Signature Stock Transfer, Inc. ("SST"), Filing No. 237; a joint motion for summary judgment filed by defendants National Financial Services, LLC, TD Ameritrade Clearing, Inc. ("TDAC"), E-Trade Clearing, LLC, and Scottrade, Inc. (collectively, the "broker defendants"), Filing No. 255; and a motion for partial summary judgment filed by plaintiff COR Clearing, LLC ("COR"), Filing No. 258.  The court heard oral argument on the motions on October 17, 2017, and October 23, 2017.

This is an action for declaratory relief, unjust enrichment, fraud, and conversion in connection with a securities transaction.  Jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332.

Essentially, COR alleges that defendants Calissio Resources Group, Inc. ("Calissio"), Adam Carter[1], and SST perpetrated a fraud on COR, the securities clearing system, and the marketplace by exploiting a weakness in clearing procedures in connection with Calissio stock. It seeks to recover funds debited from its account as a result of the allegedly fraudulent dividend scheme. COR asserts claims for fraud under Nebraska law against Calissio, Carter, and SST, and asserts claims for unjust enrichment and conversion against the broker defendants. Default judgment has been entered against Calissio. *See* Filing No. 109.

COR moves for summary judgment on its claim for conversion against the broker defendants. The broker defendants, in turn, move for a summary judgment of dismissal on all of COR's claims against them. SST moves for a summary judgment of dismissal on COR's fraud claim.

## I.    BACKGROUND AND OVERVIEW

The remaining claims in this dispute involve several financial services industry organizations that operate within the financial markets and the indirect holding system. An overall understanding of that generally-automated system, the rules that govern it, and the parties' respective roles in the system is necessary at the outset. Securities transactions are governed by both state and federal law.

Plaintiff COR is an independent clearing and settlement firm. Clearing firms generally handle the back-office details of securities transactions between broker-dealers. A broker-dealer is an individual or firm that trades securities. A clearing or

---

[1] The record shows Carter was never served. *See* Filing No. 10, Summons Issued.

carrying firm also maintains custody of securities and assets such as cash. An introducing firm accepts orders to trade but has an arrangement with a clearing or carrying firm to maintain custody of the securities account. Generally, introducing broker-dealers interact with the end client, while a clearing broker is responsible for the confirmation, receipt, settlement, delivery and record-keeping tasks involved in processing securities transactions.

The broker defendants are all financial institutions that provide clearing services to their affiliated introducing broker-dealers (e.g., defendant TDAC provides custody and clearing services for clients of TD Ameritrade). COR's principal business is the provision of custody and settlement services to introducing broker-dealers. It provides such services to introducing broker J.H. Darbie & Co. ("J.H. Darbie"). J.H. Darbie has a clearing contract with COR.

Brokers and securities transactions are generally regulated under the Securities Exchange Act of 1934 by the Financial Industry Regulatory Authority ("FINRA"). *See* 15 U.S.C. § 78q–1(a)(1). FINRA is a non-governmental self-regulatory organization that regulates member broker defendants and exchange markets. Every firm and broker that sells securities to the public in the United States must be licensed and registered by FINRA. *See* Release, Sec. & Exch. Comm'n, S.E.C. Release No. 34-50700, *Concept Release Concerning Self-Regulation* (Nov. 18, 2004), *available at* http://www.sec.gov/rules/concept/34-50700.htm.

The Depository Trust and Clearing Corporation ("DTCC") is the Securities and Exchange Commission ("SEC") approved central clearing firm for the vast majority of shares traded in United States markets. It functions as a clearing house to process and

record trades, settle trades, issue reports to the broker-dealers, and electronically transfer funds and shares. Plaintiff COR Clearing and the defendant brokers are participant members of the DTCC. As participants, they have agreed to abide by DTCC procedures.

The indirect holding system is a system in which securities are not physical securities represented by certificates, but are represented as "book entries" in a securities account. *See* *Chase Inv. Servs. Corp. v. Law Offices of Jon Divens & Assocs., LLC*, 748 F. Supp. 2d 1145, 1167 (C.D. Cal. 2010), *aff'd*, 491 F. App'x 793 (9th Cir. 2012); 6 Thomas Lee Hazen, Treatise on the Law of Securities Regulation § 23:1. The indirect holding system is governed by Article 8 of the Uniform Commercial Code ("U.C.C."), which, in turn, relies on definitions in federal securities laws. *See, e.g.,* Neb. Rev. Stat. § 8-101 *et seq.*[2] Article 8 of the U.C.C. was revised in 1994 and has been adopted in Nebraska. Neb. Rev. Stat. § 8-101 *et seq.*

Defendant Calissio is the issuer of the stock (CRGP) shares at issue. Defendant SST is Calissio's transfer agent. Transfer agents record changes of ownership, maintain the issuer's security holder records, cancel and issue certificates, distribute and tabulate proxies, and distribute dividends. *See* Sec.& Exch. Comm'n, S.E.C. Release No. 34-76743*, Comments on Concept Release:  Transfer Agent Regulations,* 2016 WL 2652241 at *2 (April 13, 2016); *see also* 12 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 5485 (perm. ed., rev. vol. 2004). Most transfer agents, including SST, deposit shares into the DTCC via the

---

[2] Stock transfers were at one time governed by common law, but were later codified by the Uniform Stock Transfer Act, which has since been superseded by Article 8 of the Uniform Commercial Code. 6 Thomas Lee Hazen, Treatise on the Law of Securities Regulation § 23:7.

Deposit/Withdrawal at Custodian ("DWAC") system, which is a computerized system for automatic transfers of cash and securities that permits DTCC participants to request the movement of shares to or from the issuer's transfer agent electronically.

Transfer agents are required to register with the SEC or a bank regulatory agency under Section 17A of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78q-1(c). *See also* 17 C.F.R. § 240.17A. They are not part of FINRA, nor are they participants of the DTCC, but are registered with the DTCC as long as the issuer the transfer agent represents is a participant with the DTCC. There is no self-regulatory agency that governs transfer agents the way FINRA governs brokers and broker defendants.

Transfer agents are also subject to provisions of the U.C.C. of the state in which the issuer is incorporated.[3] *Comments on Concept Release*, 2016 WL 2652241, at *2. Article 8 Part 3 of the U.C.C. covers transfer of certificated and uncertificated securities and the rights and obligations of transfer agents. *See generally* U.C.C. § 8-301 *et seq.* (Am. Law. & Inst. & Unif. Law Comm'n 1994); *e.g.*, Neb. Rev. Stat. § 8-301 *et seq.*

In addition to J.H. Darbie and the DTCC, several other entities are tangentially connected to the transactions at issue herein but are not parties. Those are Alpine Securities Corporation ("Alpine"), another financial services firm that suffered losses in connection with Calissio stock, and Nobilis Consulting, LLC ("Nobilis") and Beaufort

---

[3] Under the U.C.C., unless otherwise agreed, the laws of the issuer's state of incorporation govern the rights of securities holders, transferors, and transferees vis-a-vis the issuer. 6 Thomas Lee Hazen, Treatise on the Law of Securities Regulation § 23:7; *See* U.C.C. § 8–110(a); *In re County of Orange*, 219 B.R. 543, 550 (Bankr. C.D. Cal. 1997). That fact is of no consequence, however, since the relevant U.C.C. provisions in the relevant states are substantively the same as those in Nebraska.

Capital Partners, LLC ("Beaufort"), who are investors who held promissory notes on Calissio's debt and later converted that debt to shares of Calissio stock. J.H. Darbie is Nobilis's and Beaufort's introducing broker, who uses COR for clearing and settlement.

FINRA is authorized by the S.E.C. to adopt and administer the Uniform Practice Code ("UPC"), "the rules and regulations governing [over-the-counter] secondary market securities transactions." *In re THCR/LP Corp.*, No. 04-46898/JHW, 2006 WL 530148 at *4 (Bankr. D. N.J. Feb. 17, 2006). FINRA rules regulate payment of dividends. *In re Arctic Glacier Int'l, Inc.*, No. 12-10605(KG), 2016 WL 3920855, at *5 (Bankr. D. Del. July 13, 2016), *aff'd*, 255 F. Supp. 3d 534 (D. Del. 2017). Under UPC 11140, FINRA determines which shareholders are entitled to a distribution by setting two dates: the "record date" and the "ex-dividend date" or "ex-date." *Id.* at *6; *see In re THCR/LP Corp.*, No. 04-46898/JHW, 2006 WL 530148 at *5; National Association of Securities Dealers ("NASD") (now FINRA) Notice to Members 00–54 (August 2000). The record date is fixed by the issuer and determines the holders of equity securities who are entitled to receive dividends or other distributions. *See Arctic Glacier*, 2016 WL 3920855, at *6 (emphasis omitted). The "ex-date" is "'the date on and after which the security is traded without a specific dividend or distribution.'" *Id.* (quoting UPC Rule 11120(c); *see In re THCR/LP Corp.*, 2006 WL 530148 at *5. "'Taken together, these two dates delimit the timeframe during which a security, when sold, carries with it from the seller to the buyer the right to receive a distribution'" which is known in the industry as a "due bill." *Arctic Glacier*, 2016 WL 3920855, at *6 (quoting *In re THCR/LP Corp.*, 2006 WL 530148 at *5); *see* UPC Rule 11140.

Ordinarily, the ex-date precedes the record date, but a dividend or distribution that is twenty-percent or more of the value of the subject security qualifies as a "special dividend," and the ex-date is set by FINRA as the first business day following the payable date.  *See* NASD Notice to Members 00-54 (August 2000).  If the record date precedes the ex-date, and the security is sold during the period between the two, the stock "carries with it the right to receive a distribution, a 'due bill,' from the seller to the buyer."  *Karathansis v. THCR/LP Corp.*, No. CIV. 06-1591(RMB), 2007 WL 1234975, at *4 (D.N.J. Apr. 25, 2007)*, aff'd sub nom. In re THCR/LP Corp.*, 298 F. App'x 120 (3d Cir. 2008); *see* FINRA Uniform Practice Advisory (UPC # 55-13) (December 19, 2013); NASD Notice to Members 00–54 (August 2000) (noting that a due bill is a promissory note for the dividends that is attached to a stock that is traded between the record date and the ex- date); *Silco, Inc. v. United States*, 779 F.2d 282, 284 (5th Cir. 1986).

The DTCC implements the allocations of due bills under UPC 11140.  The DTCC's interim accounting process automates the settlement of due bills.  The process entails capturing on a daily basis all the trade settlements that include due bills and then debiting and crediting the accounts of member firms in order to pass the dividend proceeds to the appropriate party.

Each security is assigned a Committee on Uniform Securities Identification Procedures ("CUSIP") number.  A CUSIP number is a unique nine-character alpha/numeric code to a security by Standard and Poor's Corporation.  The number is used to expedite clearance and settlement.  A CUSIP number is assigned to each issue and may need to be changed when there is a Corporate Action.

II.     FACTS

The facts are not in serious dispute. The following facts are gleaned from the parties' respective statements of uncontroverted facts and from the exhibits submitted in connection with the motions. *See* Filing No. 238, SST Brief at 3-7; Filing No. 249, COR's Brief at 4-15 Filing No. 277, SST Reply Brief at 2-5; Filing No. 256, Brokers' Brief at 5-14; Filing No. 289, COR's Brief at 4-23; Filing No. 296, Brokers' Reply brief at 4-14; Filing No. 259, COR's Brief at 3-13; Filing No. 284, Brokers' Brief at 5-13; Filing No. 299, COR's Reply Brief at 39-53; Filing Nos. 239, 250, 260, 261, 278, 285, 290, Indices of Evid. The record shows that Calissio is an issuer of penny stock in a corporation engaged in mining activities in Mexico.[4] Calissio had a contractual relationship with SST as its transfer agent. SST became Calissio's transfer agent in roughly 2001. Filing No. 250-2, Index of Evid., Ex. A, Deposition of Jason Bogutski at 6.

On June 1, 2015, Calissio announced a "stock repurchase program of up to 1.5 million of the Company's outstanding common shares." Filing No. 290-20, Index of Evid., Ex. R, Calissio Annual Information Disclosure at 13. On June 16, 2015, Calissio issued a press release, announcing the company's

> first quarterly cash dividend of approximately USD$1.3 million, or USD$0.011 per common share of the Company (each a "Common Share"), payable on or about August 17, 2015 to the holders of the issued and outstanding Common Shares as of the close of business on June 30, 2015. The Board also approved a special stock dividend of 3% payable August 17, 2015 to shareholders of record at the close of business on June 30, 2015.

---

[4] A "penny stock," is a stock that typically trades outside of the major market exchanges at a relatively low price and has a small market capitalization.

Filing No. 260-12, Index of Evid., Ex. K.[5]  The Calissio Board of Directors' Statement of Consent states that "the Company hereby authorizes a $0.011 per common regular share (free trading share) cash dividend to its shareholders.  The dividend shall have a record date of June 30, 2015, an ex-dividend date of June 26, 2015 and a payment date of August 17, 2015."  Filing No. 250-9, Index of Evid., Ex. H.  People who owned CRGP shares on the record date were to be paid the dividend.  Calissio's Annual Information Disclosure also states that [a]s of June 30, 2015, Calissio had 129,460,000 issued and outstanding shares of common stock with a par value of $.01 per share.  Filing No. 290-20, Index of Evid., Ex. R.  The Annual Information Disclosure also shows that "[e]ffective on October 6, 2014 the Company changed its name to Calissio Resources Group, Inc. having new CUSIP number of 130 88P 102."  *Id.* at 2.  The Annual Information Disclosure listed the following restriction on the transfer of securities:  "As of June 30, 2015, other than 27,179,423 shares of its common stock that are free-trading, all the other 102,280,577 shares are restricted and subject to Rule 144.[6]  The combined total of free trading and restricted shares issued and outstanding on June 30, 2015 are 129,460,000."  *Id.* at 4.  On August 18, 2015, FINRA issued an ex-date determination of August 19, 2015, with respect to the Calissio dividend. Filing No. 261-2, Index. of Evid., Ex. A, Answers to Requests for Admission at 14.

---

[5] As discussed above, because the amount of the dividend that was announced by Calissio exceeded twenty-five percent of the price at which Calissio stock was trading at the time, it was categorized as a "special dividend" subject to the rule establishing the ex-date as following the payable date.

[6] Rule 144 deals with sales of restricted securities. *See* 17 C.F.R. § 230.144.

The record shows that investors Nobilis and Beaufort had earlier loaned money to Calissio and held promissory notes for the debts. Between July 29, 2015, and August 19, 2015, Nobilis and Beaufort converted that debt to equity. Filing No. 261-2, Index of Evid., Ex. A, Answers to Requests for Admission at 14-15. Calissio issued new shares as a result of the debt-to-equity conversion through its transfer agent, SST, who admits that it records the issuance of shares by its customer companies, maintains records of an issuer's stock and bond holders, records changes of ownership, issues or cancels certificates, and resolves problems arising from lost, destroyed, or stolen certificates. *See* Filing No. 278-1, Ex. 32, FINRA FAQs.

As a result of converting the debt to equity, Nobilis obtained 327 million CRGP shares, and Beaufort obtained 90 million CRGP shares. Filing No. 261-2, Answers to Requests for Admission at 14-15. Nobilis and Beaufort were customers of J.H. Darbie, who was an introducing or correspondent broker who used COR as its clearing and settlement firm. COR Clearing admits that it approved the new shares for deposit on its platform. COR's client acknowledgement form, which is included in each tranche of each conversion of debt to equity, COR states that sales of the securities "may not be permitted by [COR] until such time that [COR] is satisfied that they are eligible for sale and transfer, without fear of impairment or violation of law or industry rule." Filing No. 239, Index of Evid., Exs. 1B-12B. COR acknowledges it has a duty to prevent fraud generally, as well as to conduct anti-money-laundering reviews. Filing No. 278-6, Index of Evid., Deposition of Carlos Salas at 37; *see also* Filing No. 83, Transcript of Hearing dated Nov. 10, 2015 at 42-45 (Salas testimony acknowledging duties to conduct a heightened review under FINRA Notice to Members 09-05).

As part of its review under FINRA Notice 09-05, COR reviewed certain documentation relating to a conversion of shares. Filing No. 239, Exs. 1-12. COR provides its correspondent brokers with a Heightened Risk Securities Correspondent Guidebook and Heightened Risk Securities Deposit Document Requirements Checklist. Filing No. 278-3. After that review, COR deposited with the DTCC at least 340 million new shares of CBPB, thus permitting the shares to be traded. COR cleared shares that were sold by J.H. Darbie on behalf of Darbies's customers, Nobilis and Beaufort.

Evidence shows that the supporting paperwork submitted to COR by its correspondent broker Darbie was factually inaccurate. *See* Filing No. 239, Exs. 1-12. The supporting documents show that Darbie's customers listed number of shares for each tranche of each conversion was under 10% of total shares but the aggregate was in excess of 10%. *Id.* Responses to COR's heightened risk security questionnaire show a possible Rule 144 violation and indicia that Calissio was a shell corporation given its lack of assets and business activity. *Id.*

With respect to the Calissio shares issued in July and August 2015, SST prepared a form stock certificate in accordance with its written internal procedures once it received an issuance resolution and attorney opinion. Filing No. 278-4, Ex. 35, Affidavit of Jason Bogutski; Filing No. 278-5, Procedures. It reviewed the issuance resolution and the respective attorney opinions and found all shares issued during that time frame were free trading shares, consistent with other similar shares. Filing No. 278-4, Ex. 35, Affidavit of Jason Bogutski. SST reviewed a DWAC placed by the clearing firm COR, noted the number of shares that matched the number for each issue per the issuance resolution and opinion letter received and DWAC forms completed by

11

the shareholder. The number of shares matched the number of shares shown on DTCC system placed by COR and SST completed the DWAC and SST was able to complete the DWAC. *Id.*

The evidence establishes that Calissio instructed its transfer agent, SST, to issue the new shares with the same CUSIP number that was used for pre-record date shares. The parties agree that shares of stock that are issued after the announced record date for a dividend do not qualify for the dividend. The evidence also shows that the issuer generally requests a CUSIP, although a transfer agent can request one if instructed to or authorized by the issuer.

The parties agree that DTCC's automated interim accounting system treated the post-record date shares the same as pre-record date shares and attached due bills to all shares on deposit at DTCC. Because all Calissio shares on deposit with DTCC during the period June 1 to August 21, 2015 had the same CUSIP, DTCC considered them as fungible within DTCC's system.

Pursuant to its procedures, DTCC allocated debits and credits for the due bills on the purchases and sales of CRGP shares. Only roughly 20% of the available Calissio shares were eligible for the dividend, but DTCC made payments on all shares on its system and not just those entitled to dividends. DTCC levied due bills on sellers' shares and paid the proceeds to the member firms that represented purchasers. DTCC debited COR in the approximate amount of 3.7 million dollars. Similarly, DTCC allocated credits to the broker defendants for customers who had purchased the Calissio shares carrying a due bill. These included the defendant broker defendants.

In total, $4,685,330.43 in credits were allocated by DTCC for dividends on the purchases of the Calissio shares. Of that amount, $934,193.35 was allocated to TD Ameritrade; $812,105.51 was allocated to NFS; $1,278,507.38 was allocated to E-Trade; and $712,659.94 was allocated to Scottrade. The balance was allocated to sixty-nine other clearing or broker defendants that are not parties to this action. The broker defendants credited the payments to the end customer accounts on their platforms.

COR subsequently debited the J.H. Darbie accounts of Beaufort and Nobilis for the amounts attributable to the Calissio shares Nobilis and Beaufort had sold, recovering approximately $700,000 each from those accounts. COR later took action to recover the roughly $3.7 million from J.H. Darbie and its customers, Nobilis and Beaufort, through FINRA arbitration. The record shows COR has settled with J.H. Darbie and J.H. Darbie has agreed to pay COR approximately $1.7 Million. It has an arbitration award against Nobilis and arbitration with Beaufort is pending.

## III.    LAW

### A.    Summary Judgment Standards

Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042, (8th Cir. 2011) (en banc) (quoting *Celotex*, 477 U.S. at 323). If the movant does so, "the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324). A "genuine" issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986).

The evidence must be viewed in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *Kenney v. Swift Transp., Inc.*, 347 F.3d 1041, 1044 (8th Cir. 2003). "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Koehn v. Indian Hills Cmty. Coll.*, 371 F.3d 394, 396 (8th Cir. 2004).

### B.     FINRA Obligations

FINRA Regulatory Notice 09-05 identifies situations in which broker-dealers and associated persons ("firms") should conduct a searching inquiry to comply with their regulatory obligations under the federal securities laws and FINRA rules. The notice reminds firms of their responsibilities to ensure that they comply with the federal securities laws and FINRA rules when participating in unregistered resales of restricted securities. The notice obligates firms to take reasonable steps to ensure that the

company issuing shares is not a shell corporation. FINRA Regulatory Notice 90-05 (Jan. 2009) at 5. "Failure to conduct appropriate inquiry and respond to red flags may have consequences under both the federal securities laws and [anti-money laundering] requirements." *Id.* at 9. The regulatory notice further provides:

> FINRA, the SEC and the courts have repeatedly held that firms cannot rely on outside counsel, clearing firms, transfer agents, issuers, or issuer's counsel to discharge their obligations to undertake an inquiry. Moreover, the fact that securities have been issued by a transfer agent without a restrictive legend, or have been put into trading status by a clearing firm, does not mean that those securities can be resold immediately and without limitation under the Securities Act.

*Id.* However, as a matter of law, a transfer agent whose sole involvement is to issue shares without restriction as directed in reliance on attorney opinions is insufficient to hold it liable in a fraudulent stock scheme. *S.E.C. v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1258-1259 (9th Cir. 2013).

### C. Nebraska Law

#### 1. Conversion

"Conversion is any unauthorized or wrongful act of dominion exerted over another's personal property which deprives the owner of his property permanently or for an indefinite period of time." *Roth v. Farmers Mut. Ins. Co.*, 371 N.W.2d 289, 291 (Neb. 1985). "The plaintiff in an action for conversion must allege facts showing a right to immediate possession of the property at the time of the conversion." *PWA Farms v. North Platte State Bank*, 371 N.W.2d 102, 105 (Neb. 1985); *see also Cattle Nat. Bank of Seward v. York State Bank & Tr. Co.*, 428 N.W.2d 624, 627 (Neb. 1988).

#### 2. Unjust Enrichment

In order to recover on a claim for unjust enrichment, a plaintiff must prove that "(1) the defendant received property or money from the plaintiff; (2) the defendant retained possession of the property; and, (3) the defendant in justice and fairness ought to pay the money to the plaintiff." *Kanne v. Visa U.S.A., Inc.,* 272 Neb. 489, 501, 723 N.W.2d 293, 302 (2006) (affirming dismissal on the plaintiffs' unjust enrichment claim "because [the plaintiffs] do not and cannot allege that [defendants] unjustly obtained or retained any money from [the plaintiffs]").

### 3. Fraud

In order to prove fraud or misrepresentation under Nebraska law, plaintiffs must prove: (1) that a representation was made; (2) that the representation was false; (3) that when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) that it was made with the intention that the plaintiff should rely upon it; (5) that the plaintiff did so rely; and (6) that he or she suffered damage as a result. *Freeman v. Hoffman La Roche, Inc.,* 618 N.W.2d 827, 844-45 (Neb. 2000). False representations must be the proximate cause of the damage before a party may recover. *Huffman v. Poore,* 569 N.W.2d 549, 560 (Neb. Ct. App. 1997).

Absent information that should put a recipient on notice that a representation may be false, a person may generally rely on the truth of another's representation. *deNourie & Yost Homes, LLC v. Frost,* 854 N.W.2d 298, 314 (Neb. 2014) (quoting *Omaha Nat. Bank v. Mfrs. Life Ins. Co.,* 332 N.W.2d 196, 203 (Neb. 1983)). In intentional misrepresentation cases, a plaintiff fails to exercise ordinary prudence only when the plaintiff's reliance is wholly unreasonable, given the facts open to the plaintiff's

observation and his or her own skill and experience. *Id.* "[A] plaintiff 'may not close his eyes to what is obviously discoverable by him.'" *Id.* (quoting *Lucky 7 v. THT Realty*, 775 N.W.2d 671, 676 (Neb. 2009)).

### 4. Uniform Commercial Code

Under the U.C.C. in Nebraska, a security entitlement is created "if a securities intermediary . . . indicates by book entry that a financial asset has been credited to the person's securities account" or "receives a financial asset . . . and accepts it for credit to the person's securities account." Neb. Rev. Stat. (U.C.C.) § 8-501(b)(1)&(2). A "securities intermediary" is either a clearing corporation or any person, including a bank or broker, that in the ordinary course of business maintains securities accounts for others. *Id.*; *see* Neb. Rev. Stat. (U.C.C.) § 8-102(a)(14). Once a securities intermediary indicates by book entry that a security has been credited to one's account, the account holder becomes an "entitlement holder" and acquires a securities entitlement against the securities intermediary. Neb. Rev. Stat. § 8-102(a)(7). The property interests in "that financial asset held by the securities intermediary are held by the securities intermediary for the entitlement holders," and "are not property of the securities intermediary." Neb. Rev. Stat. (U.C.C.) § 8-503(a).

"A securities entitlement is 'a package of personal rights against the securities intermediary and an interest in the property held by the securities intermediary.'" *Chase Inv. Servs.*, 748 F. Supp. at 1167; *see* Neb. Rev. Stat. § 8-102, U.C.C. official cmt. 17. Part 5 of Revised Article 8 of the Commercial Code defines the rights of the entitlement holder and the duties of the securities intermediary. Neb. Rev. Stat. § 8-102, U.C.C. official cmt. 17 (stating "[I]n a sense, then, the entirety of Part 5 is the definition of

17

security entitlement").  Chief among such rights, the securities intermediary must treat the entitlement holder as "entitled to the financial asset," and ensure that the entitlement holder "receives all of the economic and corporate rights that comprise the financial asset." Neb. Rev. Stat. § 8-501, U.C.C. official cmt. 2; Neb. Rev. Stat. § 8-503, U.C.C. official cmt. 2.

> Under Neb. Rev. Stat. (U.C.C.) § 8-102(9), financial asset means
>
> (i) a security;
>
> (ii) an obligation of a person or a share, participation, or other interest in a person or in property or an enterprise of a person, which is, or is of a type, dealt in or traded on financial markets, or which is recognized in any area in which it is issued or dealt in as a medium for investment; or
>
> (iii) any property that is held by a securities intermediary for another person in a securities account if the securities intermediary has expressly agreed with the other person that the property is to be treated as a financial asset under this article. As context requires, the term means either the interest itself or the means by which a person's claim to it is evidenced, including a certificated or uncertificated security, a security certificate, or a security entitlement.

Neb. Rev. Stat. § UCC § 8-102 (9). A securities intermediary is to take action to obtain any payments or distributions made by the issuer of the financial asset.  Neb. Rev. Stat. (U.C.C.) § 8-505(a).

As a general proposition, under the U.C.C., brokers are immunized from liability "in connection with their activities as conduits for the transfer of securities on behalf of their customers."  *Decker v. Yorkton Sec., Inc.*, 106 Cal. App. 4th 1315, 1320–21 (2003) (interpreting a California U.C.C. provision identical to Nebraska's).  Absent any collusion with a wrongdoer,

> [a] securities intermediary that has transferred a financial asset pursuant to an effective entitlement order, or a broker or other agent or bailee that

has dealt with a financial asset at the direction of its customer or principal,
is not liable to a person having an adverse claim to the financial asset.

Neb. Rev. Stat. § 8-115.  "[A] broker will not be liable even if it 'has notice that someone asserts a claim to a customer's securities or security entitlements,' because 'the firm should not be placed in the position of having to make a legal judgment about the validity of the claim at the risk of liability either to its customer or to the third party for guessing wrong.'" *Id.* at 1321 (quoting Cal. Com.Code § 8115 cmt. 3, which mirrors Neb. Rev. Stat. (U.C.C.) § 8-115 official cmt. 3). Section 8-115 "embodies one of the fundamental principles of the article 8 indirect holding system rules—that a securities intermediary owes duties only to its own entitlement holders." Neb. Rev. Stat. (U.C.C.) § 8-115, official cmt. 4.

The securities intermediary or broker may be held liable to an adverse claimant only if it took action after being served with a restraining order or other legal process, it acted in collusion with a wrongdoer in violating the rights of an adverse claimant, or in the case of a security certificate that has been stolen, it acted with notice of the adverse claim. Neb. Rev. Stat. (U.C.C.) § 8-115(1)-(3); *see id.*, official cmt 5 (stating "[i]f the conduct of a securities intermediary or a broker or other agent or bailee rises to a level of complicity in the wrongdoing of its customer or principal, the policies that favor protection against liability do not apply."). Under Neb. Rev. Stat. (U.C.C.) § 8-115(2), "Knowledge that the action of the customer is wrongful is a necessary but not sufficient condition of the collusion test." *Id.*, official cmt. 5.  Further,

The aspect of the role of securities intermediaries and brokers that article 8 deals with is the clerical or ministerial role of implementing and recording the securities transactions that their customers conduct. Faithful performance of this role consists of following the instructions of the

customer. It is not the role of the record keeper to police whether the transactions recorded are appropriate, so mere awareness that the customer may be acting wrongfully does not itself constitute collusion.

*Id.*

An intermediary or broker is not insulated from liability, however, "in egregious cases where its action goes beyond the ordinary standards of the business of implementing and recording transactions, and reaches a level of affirmative misconduct in assisting the customer in the commission of a wrong." *Id.* The collusion exception does not apply if the defendant allegedly ignored red flags but took no affirmative steps to commit the wrong. *See, e.g., H & R Block Fin. Advisors, Inc. v. Express Scripts, Inc., 426 F.Supp.2d 656, 661–63 (E.D. Mich. 2006)* (interpreting Michigan U.C.C.). A broker is not protected under § 8-115 in the face of evidence that he had not only ignored red flags but "blatantly ignored and suppressed conclusive evidence" that a customer did not own the stock at issue. *H & R Block*, No. 05–73306, 2006 WL 2125226, at *6 (E.D. Mich. July 27, 2006) (involving redemption of a mistakenly-issued stock certificate worth over $7 million).

Under the Nebraska U.C.C., investors in the indirect and direct holding system are protected from adverse claims, "whether framed in conversion, replevin, constructive trust, equitable lien, or other theory," if they acquire a security entitlement for value and without notice of the adverse claim. *See* Neb. Rev. Stat. (U.C.C.) §§ 8-303; 8-502. The U.C.C. in Nebraska also makes it explicit that a securities intermediary that receives a financial asset and establishes a security entitlement in respect thereof in favor of an entitlement holder is a "purchaser" of the financial asset that the securities

intermediary received and gives value by incurring obligations to its own entitlement holder.  *See* Neb. Rev. Stat. (U.C.C.) § 8-116, official cmt. 1.

Article 8 Part 4 of the U.C.C. covers registration of securities.  Neb. Rev. Stat. (U.C.C.) § 8-401 – § 8-407.  Under Neb. Rev. Stat. (U.C.C.) § 8-407, a transfer agent is liable to the owner of a security for the wrongful registration of that security. *See* Neb. Rev. Stat. (U.C.C.) § 8-407, official cmt. 1.  "The transfer agent must pass on and satisfy himself as to the validity and propriety of the transfer, and the transfer agent is generally held liable for the improper issue and transfer of certificates, both to the corporation and to persons injured." *Ferer v. Erickson & Sederstrom, P.C.*, 718 N.W.2d 501, 506 (Neb.), *opinion supplemented on overruling of reh'g*, 759 N.W.2d 75 (Neb. 2006).

## III.    DISCUSSION

The court first finds that the dispute between the parties involves questions of law.  The salient facts are not in any real dispute.  The claims between the parties to this lawsuit can be resolved as a matter of law and summary judgment is proper.

### A.    COR's Motion

Plaintiff COR seeks partial summary judgment against the broker defendants on its claim for conversion.  The broker defendants argue that COR's claims are barred by operation of law under two provisions of the Nebraska Uniform Commercial Code, Neb. Rev. Stat. (U.C.C.) §§ 8-502 and 8-115 (U.C.C.).  Alternatively, the broker defendants argue that the plaintiff has not established that they wrongfully converted COR's property to their own use because it was passed on to their customers.

In response, COR argues that U.C.C. § 8-115 does not apply because a transfer of money, and not securities, is involved. COR further argues it has established the requisite elements of conversion and is entitled to judgment in its favor on the claim.

The court finds COR's motion for summary judgment on its conversion claim should be denied. First, COR has not established the elements of a conversion claim. The evidence shows that the brokers did not have possession, dominion, or control over the payments on the due bill credits. It is undisputed that the DTCC assessed and allocated the due bill credits and the brokers immediately credited the payments to their customers or clients, the purchasers of the shares. Under the Nebraska U.C.C., property interests in financial assets held by a securities intermediary are held by the securities intermediaries "for the entitlement holders," and "are not property of the securities intermediary." Neb. Rev. Stat. (U.C.C.) § 8-503(a). Further, the brokers' possession of the assets was fleeting. Also, COR has not shown that it had any right to immediate possession of the due bills at issue.

Most importantly, however, the evidence shows as a matter of law that the brokers are immunized from liability by virtue of the operation of Neb. Rev. Stat. (U.C.C.) §§ 8-115 and 8-502. COR has not alleged or shown any collusion between the alleged fraudster, Calissio, and the brokers so as to come within the exception covered under Neb. Rev. Stat. (U.C.C.) § 8-115(2). There is similarly no notice that the brokers were on notice of any potential adverse claims.

The court rejects COR's contention that the U.C.C. provisions do not come into play because the due bills are not financial assets under the U.C.C. The due bills represent distributions from an issuer that a shareholder would be entitled to receive,

and a securities intermediary would be obliged to obtain and deliver to the shareholder under federal securities laws and the U.C.C. The dividend/distribution is part of the economic and corporate rights that comprise the financial asset. Accordingly, the court finds COR's motion for summary judgment on its conversion claim should be denied.

### B. Broker Defendants' Motion

The broker defendants move for summary judgment on all of COR's claims against them—unjust enrichment, conversion, and imposition of a constructive trust. They again argue that COR's claims are barred by operation of law under two provisions of the Nebraska Uniform Commercial Code, Neb. Rev. Stat. (U.C.C.) §§ 8-502 and 8-115 (U.C.C.). They assert those provisions render them immune from suit for unjust enrichment as well as conversion. Further they argue that the imposition of a constructive trust is a remedy dependent on a finding of unjust enrichment and not a freestanding claim. Further they argue that undisputed evidence shows that the broker defendants have not received, benefitted from, or retained any money or property from COR so as to be liable for either conversion or unjust enrichment. In response, COR again argues that the U.C.C. provisions do not apply because a transfer of money, not securities, is involved.

For the reasons stated above in connection with COR's motion, the court finds that the brokers' motion should be granted with respect to COR's conversion claim. The brokers have shown that they are protected from liability under the relevant U.C.C. provisions. The U.C.C. provides protection to a securities intermediary from an adverse claim whether framed as a claim for conversion or for imposition of an equitable lien or constructive trust. An unjust enrichment claim is an equitable claim for determination by

23

the court, resulting in imposition of a constructive trust and would come within the purview of the immunity afforded under the U.C.C.  Accordingly, the claim is barred as a matter of law under the U.C.C. and the brokers are entitled to a judgment of dismissal.

Alternatively, the court finds there is no evidence that the broker defendants were unjustly enriched by the turn of events at issue.  Based on the undisputed evidence before the court, the court is unable to find that in justice and fairness the brokers should pay money to COR.  The plaintiff has not established that the brokers received or retained any property rightfully belonging to the plaintiff nor have they shown that, if they had, the brokers "in justice and fairness" should pay it to COR.

The undisputed evidence before the court shows that, as between the broker defendants and COR, the broker defendants are no more culpable or responsible for the losses at issue than COR.  Recovery from the broker defendants is not proper under these facts.  The evidence shows that the losses at issue were occasioned by the DTCC's automated system assigning due bills to shares of stock that were not entitled to a dividend because they were issued after the record date, but were assigned the same CUSIP number as the earlier-issued shares.  The issuer, Calissio, is the party responsible for the CUSIP and bears the ultimate responsibility for the resulting mix-up.  FINRA regulations, however, place an inquiry obligation on securities firms before they accept certain securities.  COR's president testified at a hearing in this case that it had procedures for such review. The documentation produced by COR's correspondent broker, Darbie, was apparently submitted as part of COR's attempted fulfillment of its FINRA 90-05 obligations.  Those materials signified several red flags.

As the clearing broker for Darbie, COR was aware at all times that the securities it accepted for deposit to the DTCC, ultimately sold by Nobilis and Beaufort, were issued after the record date. COR required its customers, Beaufort, Nobilis, and Darbie to prepare Heightened Risk Security packets in order to satisfy COR's obligations under FINRA Regulatory Notice 09-05. In its review of those materials, COR failed to spot red flags in connection with the debt-to-equity conversions.

There is evidence to support the conclusion that COR's own actions created the conditions that the DTCC interim accounting system utilized in processing the Calissio dividend due bills and resulted in the debit to COR on those due bills. The broker defendants did not have knowledge of the supporting facts contained in the documents submitted to COR by Darbie. COR was the only clearing firm member of DTCC that had knowledge of the facts connected to the debt-to-equity conversion by Nobilis and Beaufort that resulted in the issuance of the new shares.

Evidence suggests COR knew the details of the dividend announced by Calissio and was the only clearing firm aware of the data that on its face appears inaccurate or false on the paperwork it received and approved—including misrepresentations as to number of shares held, acquisition dates, holding periods, ability to acquire more shares, beneficial rights, etc.—and was the only clearing firm privy to the suspect selling activity of Nobilis and Beaufort. In any event, COR was in a better position to protect itself, and the market, than the defendant brokers were.

Under these circumstances, the equities do not favor COR and the court would not be inclined to find any unjust enrichment by the defendant brokers. Also, the evidence shows that COR has utilized the remedies available to it under its contracts

with its correspondent broker Darbie, has debited the accounts of Nobilis and Beaufort, and has availed itself of FINRA's arbitration procedures. It appears that COR's remedies lie with Calissio, Carter, Darbie, Nobilis, and Beaufort. The collectability of any recovery from those entities is not an issue that this court should consider in connection with the claims between the parties presently before the court. Nothing "in fairness and justice" indicates that COR should recover from the defendant brokers or their end customers. Accordingly, the court finds the defendant brokers are entitled to judgment on the unjust enrichment claim. The imposition of a constructive trust is a remedy which requires that COR first establish the elements of its underlying claims, so the plaintiff's purported claim for constructive trust is also subject to dismissal.

## C.    SST's Motion

Defendant Signature Stock Transfer, Inc. ("SST") also moves for summary judgment on COR's claims for fraud, unjust enrichment, and a declaratory judgment.[7] It argues that COR has not shown that SST had the required state of mind to support a claim of fraud, nor has it shown any reliance on SST's representations. Also, SST argues there is no evidence that SST received or retained any of the alleged $4 million in dividend credits that comprise the supposed windfall that is the basis of COR's unjust enrichment claim. SST asserts that it is not a DTCC participant and had neither the ability nor responsibility to notify DTCC of any dividend issues in advance of the pay date, nor is it covered by FINRA. Further it argues that COR knew as much if not more

---

[7] COR has not asserted a conversion claim against defendant SST.

than SST as it pertained to this matter and acted in conscious disregard of red flags in connection with Calissio, the dividend, and the debt-to-equity transaction.

The court agrees with SST's assessment that a transfer agent's duties are generally administrative in nature. There is no evidence that SST had any actual knowledge that anything was amiss in the transactions at issue. A transfer agent is responsible for recording changes of ownership of securities and the like. A transfer agent has duties imposed by the SEC to ensure the recording is accurate and can fulfill that duty by relying on corporate resolutions and attorney opinions. Transfer agents are not governed by FINRA and are not subject to the inquiry obligations imposed under FINRA Regulatory Notice 09-05. SST has contractual obligations to Calissio, not to COR.

At oral argument, COR's counsel suggested that its theory of recovery is based on the principal/agent relationship between Calissio and SST, suggesting that its principal Calissio's awareness of material misrepresentations to the market could somehow be imputed to SST. There is no authority for that position. Counsel also argued that SST acted in reckless disregard of the truth in failing to correct the alleged misstatements. The elements of a fraud claim, however, require an intent to defraud. Evidence that amounts to negligence, even gross negligence, will not suffice. The evidence suggests that SST may have been at most negligent in connection with the transaction, but there is no evidence of intent to defraud.

Further, COR cannot show that it reasonably relied on any alleged misstatements by SST. COR was in possession of the same information as SST. Even assuming that SST made material misstatements, which the evidence does not support,

COR had information that would have put it on notice that the information may have been false or misleading, so as to make any reliance on such statements "wholly unreasonable, given the facts open to [COR's] observation and [its] own skill and experience." *See deNourie & Yost Homes, LLC,* 854 N.W.2d at 314. The evidence shows COR failed to exercise reasonable prudence and effectively "close[d its] eyes to what [was] obviously discoverable by [it]." *Id.* (internal quotation omitted).

Although a transfer agent can be liable under the U.C.C. for wrongful registration of a security under Neb. Rev. Stat. (U.C.C.) § 8-407, COR made no claim under the U.C.C. and there is no allegation or evidence that the registration was wrongful, invalid or improper. There is no evidence that SST did anything other than that which it was instructed to do.

With respect to the unjust enrichment claim, there is no evidence that SST has been unjustly enriched, and for the reasons stated above with respect to the broker defendants, the court finds the equities do not favor COR on that claim. Accordingly, the court finds SST's motion for summary judgment should be granted.

IT IS ORDERED:

1.      Defendant Signature Stock Transfer, Inc.'s motion for summary judgment (Filing No. 237) is granted;

2.      Defendants National Financial Services, LLC's, TD Ameritrade Clearing, Inc.'s, E-Trade Clearing, LLC's, and Scottrade, Inc.'s joint motion for summary judgment (Filing No. 255) is granted;

3.      Plaintiff COR Clearing Inc.'s motion for partial summary judgment (Filing No. 258) is denied;

4.	The parties' pending motions in limine ([Filing No. 266](#) and [Filing No. 270](#))

are denied as moot;

5.	A judgment of dismissal will issue this date.


Dated this 6th day of November, 2017.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge